<pre>
 1                IN THE UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF ILLINOIS
 2                         EASTERN DIVISION

 3   IN RE:  MICHAEL A. WOLF,        )  Case No. 19 C 1978
                                     )
 4                    Debtor.        )
     _____ )  (Bankruptcy
 5                                   )  Case No. 14 B 27066)
     N. NEVILLE REID, not            )
 6   individually but solely in      )
     his capacity as Chapter 7       )
 7   Trustee for the bankruptcy      )
     estate of Michael A. Wolf,      )
 8                                   )
                      Plaintiff,     )
 9                                   )
          v.                         )
10                                   )
     MMQB, Inc., et al.,             )  Chicago, Illinois
11                                   )  September 18, 2024
                      Defendants.    )  1:59 p.m.
12
           TRANSCRIPT OF PROCEEDINGS - CITATION TO DISCOVER ASSETS
13             BEFORE THE HONORABLE JOHN J. THARP, JR.

14   APPEARANCES:

15   For the Plaintiff:      NISEN & ELLIOTT, LLC
                             BY:  MR. DANIEL P. DAWSON
16                           180 N. LaSalle Street, Suite 3600
                             Chicago, Illinois 60601
17
     Pro Se Respondent:      MR. MICHAEL WOLF
18

19
     Court Reporter:         KELLY M. FITZGERALD, RMR, CRR
20                           Official Court Reporter
                             219 S. Dearborn Street, Room 2304A
21                           Chicago, Illinois  60604
                             Telephone:  (312) 818-6626
22                           kmftranscripts@gmail.com

23
                            *    *    *    *    *
24
                     PROCEEDINGS REPORTED BY STENOTYPE
25      TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION
</pre>

1      (Proceedings heard in open court:)

2            THE COURT:  All right.

3            Can we have the trustee's counsel put your appearance

4      on the record, please.

5            MR. DAWSON:  Good afternoon, Judge.  Dan Dawson,

6      special counsel for the trustee Neville Reid.  And I am here

7      with Mr. Reid also.

8            THE COURT:  All right.

9            MR. REID:  Good afternoon, Judge.

10            THE COURT:  Good afternoon.

11            And Mr. Wolf?

12            MR. WOLF:  Michael Wolf.

13            THE COURT:  All right.  We set this hearing this

14      afternoon after our prior status hearings set date for

15      production of documents.  That was supposed to take place by I

16      believe August 19th, and we set this for an evidentiary

17      deposition relating to those materials.

18            Are we prepared to go forward?

19            MR. DAWSON:  We are, Judge.

20            THE COURT:  All right.

21            MR. DAWSON:  Which does not mean that all the

22      documents were produced; but some were, and we would like to

23      go forward.

24            THE COURT:  Okay.

25            Mr. Wolf, I'm going to ask you to come up to the

1  witness stand, please, right over here to my right.  And

2  before you sit down, please raise your right hand.

3     (Witness sworn.)

4          THE COURT:  Please be seated.

5          All right.  Mr. Dawson, you may proceed.

6       MICHAEL WOLF, DEFENDANT HEREIN, DULY SWORN,

7                        EXAMINATION

8  BY MR. DAWSON:

9  Q.  Would you state your name and spell your last name,

10  please?

11  A.  Michael Wolf, W-o-l-f.

12  Q.  Where do you reside?

13  A.  City?  Address?

14  Q.  Address.

15  A.  11509 Gramercy Park Boulevard -- Avenue -- Gramercy Park

16  Avenue, Bradenton, Florida.

17  Q.  How long have you lived there?

18  A.  Approximately one year.

19  Q.  Who do you reside with?

20  A.  Scott Wolf.

21  Q.  Please tell us all the addresses you have resided at since

22  you filed your bankruptcy petition.

23  A.  I resided at 320 --

24  Q.  And before -- and that would be July 23, 2014.  Sorry.

25  A.  I believe at that point I was at 160 East.  It's next to

Wolf - examination

4

1   Tribune Tower.  160 East -- 160 East.  Not Grand.  One over

2   from Grand.  160 East.  It goes out to Navy Pier, steps in the

3   Tribune Tower, whatever street that is.

4   Q.  You don't remember the name of the street where you lived?

5   A.  160 East.

6   Q.  How long did you live there?

7   A.  Seven years.

8   Q.  Who did you reside with there?

9   A.  No one.

10  Q.  So if you lived there seven years, when did you -- when

11  was -- when did you move?

12  A.  I moved in 2000 -- 2019.

13  Q.  Where did you move to?

14  A.  320 Central Avenue, Sarasota, Florida.

15  Q.  How long -- how long did you live there?

16  A.  Four years.

17  Q.  Who did you live with --

18  A.  Yeah, four years; four and a half years.

19  Q.  Who did you live with?

20  A.  Most of the time, Scott Wolf.

21  Q.  So are you saying that shortly after you filed your

22  bankruptcy petition and the trustee was appointed and began

23  investigating your financial affairs, you didn't move to

24  Washington, the state of Washington?

25  A.  I moved to the state of Washington sometime in -- I

Wolf - examination

changed my residency.  I did not move there.  I lived in

Chicago.  But my residency I changed to the state of

Washington in, I don't know, 2013, 2014, somewhere in there.

Q.  All right.  What do you mean by you changed your residency

but you didn't live there?

A.  I've got a Washington State driver's license.

Q.  But you never lived there?

A.  I only visited.

Q.  How many months per year were you in Washington?

A.  I was there maybe every six weeks for a week or two.

Q.  Who did you stay with?

A.  I stayed with Peter Wolf.

Q.  Why did you go to the state of Washington?

A.  I'd visit my children.

     MR. DAWSON:  Judge, can I give the witness a set of

exhibits?

     THE COURT:  Yes.

     THE WITNESS:  Can I get out my reading glasses?

     THE COURT:  Yes.

     MR. DAWSON:  Judge, I do have a copy for you if you

would like one.

     THE COURT:  Yeah, if we're going to be referring to

them.

BY MR. DAWSON:

Q.  Mr. Wolf, Exhibit 1 is the alias citation to discover

1  assets to Michael Wolf which brings you here today.

2      You've seen that before, correct?

3  A.  Looks correct.

4  Q.  Page 2, paragraph 2 commands you to produce certain

5  documents, correct?

6  A.  Yes.

7  Q.  And paragraph 3 of page 2 prohibits you from making

8  certain transfers, correct?

9  A.  Correct.

10  Q.  In fact, you didn't -- had not produced any documents as

11  of April 18th of 2024, correct?

12  A.  Correct.

13  Q.  And if you take a look at Exhibit 2, Exhibit 2 is the

14  order entered on April 18th of 2024 requiring you to produce

15  documents by May 6, 2024, correct?

16  A.  Correct.

17  Q.  In fact, you did not produce any documents by May 6, 2024,

18  as ordered, did you?

19  A.  I produced all documents that I had, which were none.

20  Q.  Mr. Wolf, is Exhibit 3 the -- your answer to the

21  third-party citation to discover assets?

22  A.  Yes.

23  Q.  And if you look at the second to last page, there's --

24  it's dated May 3, 2024.  Did you -- did you prepare this

25  document on or about May 3, 2024?

Wolf - examination

7

```
1   A.   Yes.

2   Q.   Did anyone assist you in preparing the document?

3   A.   No.

4   Q.   There's no signature on page 17 where you have a

5   verification for the answers to interrogatories.  Why did you

6   not sign it?

7   A.   Must have been an oversight.

8   Q.   I'm sorry.  Must have been an oversight did you say?

9   A.   Oversight.

10  Q.   The -- when you served your answer to the third-party

11  citation on May 3rd, you did not include any documents

12  whatsoever, did you?

13  A.   There were no relevant documents.

14  Q.   So your answer is no, you did not include any documents?

15  A.   I did not include any documents because there were no

16  relevant documents.

17  Q.   The response includes what is referred to as an opening

18  statement.  Who prepared the opening statement for you?

19  A.   Which opening statement are you talking about?  At the

20  beginning of the document?

21  Q.   Yes, sir.

22  A.   I prepared that.

23  Q.   Where did you get the case cites that are included in the

24  opening statement?

25  A.   I have Lexis -- a -- Lexis.
```

Wolf - examination

1  Q.  When you did not produce any documents, were you -- did

2  the Court later order you to produce the documents again?

3  A.  The Court expanded its definition of the documents and

4  then I complied with the Court's order.

5  Q.  Sir, if you could take a look at Exhibit 12, please, which

6  is in volume 2.  In fact, that's the order of July 18, 2024,

7  where the Court ordered that you produce documents probative

8  of respondent's relationship to any publication or entity

9  hearing -- bearing Monday Morning Quarterback in its name or

10 that is otherwise affiliated with, connected with, or derived

11 from MMQB, Inc., are within the scope of the citation.

12         Do you see that?

13 A.  Yes.

14 Q.  Did you produce any additional -- did you eventually

15 produce any documents?

16 A.  I produced documents in the scope of anything related to

17 any Monday Morning Quarterback.

18 Q.  So you eventually produced documents, correct?

19 A.  Correct.

20 Q.  Could you take a look at Exhibit 11 and please confirm

21 that those are all the documents you produced in response to

22 the citation and the two orders.

23 A.  That looks to be the complete.

24 Q.  And for the record, the documents that -- that are in

25 Exhibit 11 are the documents you produced with -- we have

Wolf - examination

9

1    Bates numbered them at the bottom because you did not and

2    solely for purposes of ease of reference.  So where it says MW

3    CIT and then has a number, that's Michael Wolf citation, and

4    we've page numbered them so we have a record of all the

5    documents you produced and did not.

6           So I would like you to go back again to Exhibit 1,

7    please, which is the citation you were responding to and the

8    documents you were ordered to produce.  And if you take a look

9    at page 8, that's where the document requests begin.  And

10   first request is all documents in support of and identified in

11   the interrogatories set forth below.  The interrogatories are

12   on page 13 -- I'm sorry, on page -- yeah, they begin on page

13   13.

14          In fact, you didn't produce any documents in response

15   to that because your response to the citation didn't

16   substantively answer any of those questions, correct?

17   A.  I'm sorry.  Could you say that again?

18   Q.  Sure.

19          Exhibit 3 is -- is your response to the citation.

20   And if you look at your response to the citation beginning at

21   page 12, are your responses to the interrogatories.  And your

22   responses to the interrogatories do not include any

23   substantive responses, correct?  They merely in essence say

24   that none of the interrogatories are relevant except for one

25   which I'm about to mention.

Wolf - examination

10

1  A.  Correct.

2  Q.  In your interrogatory, in your answer to Interrogatory

3  No. 17 which is Exhibit 3, page 16, you say:  "I have no

4  affiliation with any Monday Morning Quarterback publication

5  referred to by the trustee."

6         Do you see that?  Page 16, answer to Interrogatory

7  No. 17, second sentence.

8  A.  This is exhibit number what?

9  Q.  Exhibit No. 3, page 16, your answer to Interrogatory

10  No. 17, second sentence.

11  A.  That is correct.

12  Q.  In reality, you represent on LinkedIn that you are the

13  editor-in-chief -- the full-time editor-in-chief of MMQB and

14  have been so since October 2020, correct?

15  A.  Correct.

16  Q.  And your answer to Interrogatory No. 18 in number -- on

17  page 17 of Exhibit 3 says:  "To the best of my knowledge, I am

18  not aware of any redirected or transfer between mmqb.com and

19  mmqb.io."

20         Do you see that?

21  A.  Yes.

22  Q.  The Monday Morning Quarterback is currently published at

23  the website at mmqb.io, correct?

24  A.  The Monday Morning Quarterback is an e-mail newsletter.

25  It does not have anything particular on the website.  It's not

Wolf - examination

1    published on the website, so to speak.

2    Q.   The website -- well, here.  Why don't we take a look at

3    the actual website.

4             If you could go to Exhibit 6, please.

5             In fact, Mr. Wolf, Exhibit 6 is a copy of the Monday

6    Morning Quarterback website on May 10, 2024, correct?

7    A.   I'm -- I don't know.

8    Q.   Well, if you could take a look at Exhibit 6 --

9    A.   You're saying it is, but I don't know that it is.

10   Q.   I'm sorry.  What?

11            So if you take a look --

12   A.   Facts not in evidence.  I don't know if this is correct or

13   not.

14   Q.   I didn't ask you if it was in evidence.  I'm asking you as

15   the person who is representing himself as the editor-in-chief

16   of MMQB who has receiving all -- apparently all of the

17   proceeds from the publication of the Monday Morning

18   Quarterback since at least 2020 whether the Exhibit 6A through

19   F, including subparts 1 and 2, is a copy of the website for

20   the Monday Morning Quarterback on May 10th of 2024?

21   A.   I don't know.

22   Q.   Well, when you look at it, do you have any -- can you

23   point out to the judge anything on Exhibit 6A through F,

24   subparts 1 and 2, that was not on the website for the Monday

25   Morning Quarterback on May 10th of 2024?

Wolf - examination

1   A.  I could not say with any certainty whether it is or not.

2   Q.  So sitting here today, you can't -- your -- you can't say

3   that any of Exhibit 6 wasn't on the Monday Morning Quarterback

4   website on May 10th of 2024?

5   A.  I don't know.

6       MR. DAWSON:  And, in fact, Judge, I'll represent that

7   this is a document I printed off on May 10th of 2024 by going

8   to mmqb.com which redirected me to mmqb.io.

9   BY MR. DAWSON:

10  Q.  So when you look at Exhibit 6, Mr. Wolf, at the top of the

11  first page, you'll see that it says, the Monday Morning

12  Quarterback, correct?

13  A.  Correct.

14  Q.  And on the top, it also -- it lists the various subparts

15  of the website which includes QB features, subscribe, place a

16  job ad, advertise, submit PR, sample issue and manage

17  subscription, correct?

18  A.  It does say that.

19  Q.  And on May 10th of 2024, persons or entities could go to

20  the website by going to mmqb.com which would redirect to

21  mmqb.io and either place an ad in the Monday Morning

22  Quarterback or advertise on the Monday Morning Quarterback or

23  subscribe to the Monday Morning Quarterback, correct?

24  A.  That was never my experience.

25  Q.  I didn't ask if it was your experience.  You were the

Wolf - examination

1    editor-in-chief --

2    A.   Then I would say no.

3    Q.   So they could not do that?

4    A.   Nope.

5    Q.   Why not?

6    A.   I have no control over mmqb.com.  I have no idea.

7    Q.   So you're saying -- in any event, you're saying that

8    you -- well, let me ask you this then, second question.  If

9    any person or entity went to mmqb.io on May 10th of 2024, they

10   could subscribe to the Monday Morning Quarterback or place an

11   ad or advertise, correct?

12   A.   Correct.

13   Q.   How do -- is -- how many people on May 10, 2024, were

14   involved in publishing the Monday Morning Quarterback?

15   A.   One.

16   Q.   Who was that?

17   A.   Myself.

18   Q.   And, in fact, you created the Monday Morning Quarterback

19   in 1990, correct?

20   A.   I created many different Monday Morning Quarterbacks, that

21   is correct.

22   Q.   Who is involved in publishing the Monday Morning

23   Quarterback today?

24   A.   I am.

25   Q.   Anyone else?

Wolf - examination

14

1  A.  No one else.

2  Q.  And, in fact --

3  A.  Although, although, if you look on LinkedIn, Elizabeth

4  Wolf claims to be the publisher of the Monday Morning

5  Quarterback.

6  Q.  But you're saying --

7  A.  But I'm saying --

8  Q.  -- she's not?

9  A.  -- she does not.

10  Q.  Okay.  So -- but I'm going to ask you again, Mr. Michael

11  Wolf, you started the Monday Morning Quarterback publication,

12  right?

13  A.  Correct.

14  Q.  It was first published in April of 1990, correct?

15  A.  Correct.

16  Q.  From 1990 through 2011, you attributed the income of the

17  Monday Morning Quarterback to Zigzag, correct?

18  A.  Correct.

19  Q.  Your primary source of income, both before and after 2011,

20  was from the publication of the Monday Morning Quarterback,

21  correct?

22  A.  Incorrect.

23  Q.  On October 8, 2015, you were under oath and deposed by me

24  in connection with this case, correct?

25  A.  I don't know.  If you say so.

1   Q.   Do you not recall your -- your deposition in 2015?

2   A.   No.

3   Q.   Okay.  Mr. Wolf, at that deposition, you were sworn under

4   oath just like you are here today, correct?

5   A.   Correct.

6   Q.   And were you asked these questions and did you give these

7   answers:

8            "Q.  Prior to 2012, was the primary source of your

9   income related to the publication of the Monday Morning

10  Quarterback?

11           "A.  Yes.

12           "Q.  So after 2011, was your primary source of income

13  still from the publication of the Monday Morning Quarterback?

14           "A.  Yes."

15           Were you asked those questions and did you give those

16  answers?

17  A.   Yes, and that answer is correct.  It went from 2011 to

18  2012, 2014, yes.

19  Q.   So when did -- this -- this was a deposition taken in

20  2015, Mr. Wolf.  When did -- when are you now saying that your

21  primary source of income was not from the Monday Morning

22  Quarterback publication?

23  A.   I left the Monday Morning Quarterback publication in the

24  spring of -- spring of 2013, I believe.

25  Q.   Two years before that deposition you're saying now?

Wolf - examination

1   A.  It was two months before my wife filed for divorce.  So

2   whatever year that was.

3   Q.  And who published the Monday Morning Quarterback from 2013

4   when you're now saying you left until 2020 when your LinkedIn

5   page says you returned and you've confirmed today that you are

6   the only person publishing it?

7   A.  I believe, though I do not know exactly, it was Scott

8   Wolf.

9   Q.  How did it come about that you are saying you started to

10  publish the Monday Morning Quarterback publication again in

11  2020?

12  A.  How did it come about that I did it?

13  Q.  Yes, sir.

14  A.  Okay.  So I had heard from a number of previous

15  subscribers that the Monday Morning Quarterback, Inc.

16  publication was pathetic, did not, in fact, include the Monday

17  Morning Quarterback which is my nom de plume, if you will.

18  I'm the original Monday Morning Quarterback.  That's how I'm

19  known through the industry.  None of it -- none of those

20  publications that Scott Wolf produced under MMQB, Inc.

21  contained any editorial opinion or writing of the Monday

22  Morning Quarterback.

23  Q.  So did you pay Mike -- Scott Wolf to purchase the assets?

24  And if so, how much?

25  A.  There were no assets that he purchased, no assets that I

Wolf - examination

1  gave him.

2  Q.  Did you have a conversation with Scott Wolf at that time

3  regarding this matter?

4  A.  What year are we talking about?

5  Q.  What year did you take -- you're saying you took it back?

6  A.  I quit, and he started publishing whenever he started

7  publishing.  I don't know the date.

8  Q.  No, sir, I'm talking about when you're claiming now that

9  you took it back for no money is what my understanding is.

10 A.  Oh, in 2020?  I didn't take anything back.  It's not a

11 successor entity.  I started a new publication which is

12 entirely different from the old publication.  It is basically

13 just a set of links to stories.  And for the last two and a

14 half years, this publication has been entirely 99.9 percent

15 generated by AI, entirely different publication, covering

16 entirely different things than the publication known as the

17 Monday Morning Quarterback, Inc. published.

18 Q.  Did -- when did what you're saying was the publication by

19 MMQB, Inc. cease to be published and when did the publication

20 which you're saying is somehow different begin to be

21 published?

22 A.  I have no idea when MMQB, Inc. stopped.  For all I know,

23 it's still published.  I have no idea.  And my publication

24 began in 2020.

25 Q.  And you're the only person associated with publishing the

Wolf - examination

1   Monday Morning Quarterback that you're referring to now?

2   A.   Correct.

3   Q.   So I would ask you to take a look at Exhibit 4, please.

4   Specifically we'll start at 4A.   In fact, sir, that's an

5   advertising media kit and rates for the year 2023 for the

6   Monday Morning Quarterback, correct?

7   A.   This is the page 3 are we talking about?

8   Q.   We're talking about Exhibit 4, sub A, tab A, first page.

9   A.   Okay.   That is perhaps the media kit that I published,

10  yes.

11  Q.   I would like you to take a look at page 3, please.   Well,

12  first, while we're still on page 1, when we look at the top,

13  it says QB, but on the old pub- -- and before this point in

14  time, it said MMQB, correct?

15  A.   Correct.

16  Q.   And so other than that, the next to QB, there's a line

17  that runs left that says the Monday Morning Quarterback,

18  correct?

19  A.   Correct.

20  Q.   So this is definitely still the Monday Morning

21  Quarterback, correct?

22  A.   No, it's not that Monday Morning Quarterback.   We made

23  that QB -- I made that QB to specifically denote it from

24  previous versions of the Monday Morning Quarterback.   In fact,

25  previous versions of the Monday Morning Quarterback were PDF

Wolf - examination

1   magazines.

2   Q.   When did you prepare the advertising media kit and rates

3   for 2023 for the Monday Morning Quarterback, sir?

4   A.   Perhaps sometime in 2022.

5   Q.   That's your best recollection?

6   A.   Yes.

7   Q.   And it looks like it was published on January 1, 2023, if

8   you look at the top right?

9   A.   That is standard practice, yes.

10  Q.   And since you were the only person preparing the

11  publication, you were the person that -- responsible for all

12  the content in here?

13  A.   Yes.

14  Q.   So I would ask you to take a look at page 3 of Exhibit 4A,

15  where it says, "Our audience are the leaders."

16       Do you see that?

17  A.   Yes.

18  Q.   And, in fact, it then represents and advertises that the

19  1,681st issue since 1991 of the Monday Morning Quarterback was

20  recently published, correct?

21  A.   Correct.  You pointed that out on the Zoom call, and we

22  immediately -- I immediately went and changed those so there

23  would be no confusion.

24  Q.   So let's go back to some of the documents that we're still

25  looking for, Mr. Wolf.  If we can go back to Exhibit 1.

Wolf - examination

1   A.   Okay.  That was --

2   Q.   Request No. 2.

3   A.   It was 360 Illinois.  That's the address.

4   Q.   And we're looking at Exhibit 1, page 8, now request No. 2,

5   it requests the bank books for all accounts in the name of or

6   for the benefit of the judgment debtor and any person or

7   entity succeeding the judgment debtor as publisher of the

8   Monday Morning Quarterback, including the latest MMQB issues

9   identified on the website located at mmqb.io.

10        Do you see that?

11  A.   Including i.e. its successor entity of which this is not.

12  Q.   Well, we defined that, not the Court defined that.  We

13  defined that because that's what we believe it is, and so that

14  term is used in these documents as defined.  I understand

15  you're trying to dispute that.  You produced documents --

16  A.   I'm disputing it only because a d/b/a can't be a successor

17  entity.

18  Q.   Are you a lawyer, Mr. Wolf?

19  A.   No.

20  Q.   So when you look at request No. 2, and, in fact, are you

21  saying that Exhibit 11 A through E are the documents

22  responsive to request No. 2?  Those are the bank statements.

23  A.   Those are the bank statements that are -- that concern

24  mmqb.io.

25  Q.   And we'll get to those in a minute.  Although when you say

Wolf - examination

1　mmqb.io, those bank statements are in your name, correct?

2　A.　Correct.

3　Q.　And the tax returns you file, you identify yourself as the

4　d/b/a for MMQB, correct?

5　A.　Correct.

6　Q.　So let's go back to the request now and the documents you

7　produced and didn't produce.　Request No. 3 asks for the front

8　and back of all checks.　Are there any -- in fact, there are

9　no checks included in any of the documents you produced,

10　correct?

11　A.　It would appear so.

12　Q.　Request No. 10 asks for all documents related to the

13　assets of the judgment debtor or its successor entity during

14　the relevant period.

15　　　　　Other than the bank statements, you didn't produce

16　any documents related to the assets of the Monday Morning

17　Quarterback, or as you -- your tax return says, you, d/b/a

18　MMQB, did you?

19　A.　I produced all documents related to the assets of the

20　judgment debtor, which was none, or its successor entity

21　during the relevant period.　And there was no successor entity

22　that I'm aware of, but I did provide all documents to the

23　successor entity that you claim to be a successor entity.

24　Q.　So you're saying that the Monday Morning Quarterback has

25　absolutely no assets today, and you don't --

Wolf - examination

1    A.   Which Monday Morning Quarterback are we talking about?

2    Q.   There's only one, but you're saying -- you're trying to

3    differentiate.  So if you're saying the one at the moment,

4    where are the documents related to the assets of whatever it

5    is you're saying is MM -- is the Monday Morning Quarterback

6    today?

7    A.   Mmqb.io is a virtual publication.  There are no assets.

8    If you could explain what you believe an asset is in this case

9    or in the case of MMQB, Inc., I would be able to respond.

10   Q.   Well, then we'll go -- we'll go to some of the specifics,

11   Mr. Wolf, because we asked for many of the specifics.

12          If you take a look at request No. 28.  And we'll just

13   skip ahead but we'll come back.  It says:  "If MMQB is no

14   longer publishing the Monday Morning Quarterback, all

15   documents related to MMQB, Inc.'s cessation of publishing the

16   Monday Morning Quarterback, including, but not limited to, all

17   contracts related to any sale, purchase, assignment, or

18   transfer of any assets from MMQB, Inc. or its successor

19   entity."

20          You say that -- you say that there was no purchase,

21   correct?

22   A.   That is correct.

23   Q.   Okay.  But we can see and we will see in the documents you

24   produced that there are plenty of assets of the Monday Morning

25   Quarterback which will include, for example, the documents

Wolf - examination

1    that are in 28B, such as contracts related to advertisements,

2    subscriptions, leases, utilities, telephones, Internet

3    services, payroll services, credit cards, insurance, and bank

4    accounts.  In fact, you didn't produce any of those documents

5    related to the Monday Morning Quarterback, correct?

6    A.   I have no documents related to the Monday Morning

7    Quarterback, MMQB, Inc., whatsoever.

8    Q.   Sir, that wasn't the question.  So we're ask -- we're

9    talking about what we've defined as a successor entity and you

10   are disputing that, but it's the Monday Morning Quarterback

11   being published today.  There was an order for you to produce

12   the documents.  You didn't produce any contracts related to

13   advertisements, did you?

14   A.   We have no contracts whatsoever with any advertisers.

15   Q.   You didn't produce any documents related to subscriptions,

16   correct?

17   A.   Such as?

18   Q.   Who the subscribers of the Monday Morning Quarterback are,

19   does it have -- well, let's start there.  Are there

20   subscribers of the Monday Morning Quarterback?

21   A.   There are.

22   Q.   And, in fact, do those subscribers include entities like

23   Steelcase and Haworth and Knoll?

24   A.   I would say in those three cases, no.

25   Q.   Okay.  How about Herman Miller?

Wolf - examination

1   A.   Now known as MillerKnoll, may be a subscriber.

2   Q.   So Herman Miller was a subscriber to the Monday Morning

3   Quarterback in the 1990s, correct?

4   A.   I don't know.

5   Q.   So have you remembered your deposition on October 8th of

6   2015 yet?

7   A.   Specifically?

8   Q.   Do you recall being deposed in this case on October 8th of

9   2015?

10  A.   Was that a 2004 exam you're speaking of?

11  Q.   Yes.

12  A.   Yes.

13  Q.   Was that -- is that why you didn't remember the last one,

14  is because I said deposition and not Rule 2004 exam?

15  A.   Correct.

16  Q.   Oh.  So now you remember it?

17  A.   I remember going to a 2004 exam, yes.

18  Q.   Were you under oath at that time just like you are under

19  oath today?

20  A.   Yes, I was.

21  Q.   Were you asked these questions and did you give these

22  answers:

23         "Q.   Who are the ten biggest customers of the Monday

24  Morning Quarterback who received the Monday Morning

25  Quarterback publication via facsimile?

Wolf - examination

1        "A.  By biggest, you mean what?

2        "Q.  Corporations who would still be around so I

3  could issue a subpoena."

4      And then just skipping ahead a little:

5        "So please give us ten corporations or entities that

6  were large enough so that they'll be around who received the

7  Monday Morning Quarterback via publication."

8        "So who were they?", you were asked.

9        "A.  By large, do you mean their sales volume?

10       "Okay.  Let's start there.

11        "A.  Steelcase Incorporated, Herman Miller

12  Incorporated, Haworth Incorporated."

13      Were you asked those questions and did you give those

14  answers?

15  A.  If that's what's in the transcript.

16  Q.  So, in fact, Herman Miller was a subscriber and an

17  advertiser to the Monday Morning Quarterback in the '90s,

18  correct?

19  A.  They were never an advertiser.

20  Q.  Okay.  They were just a subscriber?

21  A.  Probably, yes, in the '90s.

22  Q.  Are they still a subscriber?

23  A.  Not to my knowledge.

24  Q.  When you say that, I thought you just said it was under a

25  different name?

Wolf - examination

1   A.   They're not a subscriber to mmqb.io that I know of.

2   Q.   What do they subscribe to?

3   A.   They perhaps were a subscriber at one point.  I don't

4   know.  I don't look over the subscriber list every day.

5   Q.   Okay.  Did you produce any subscriber lists for the Monday

6   Morning Quarterback as required by the citation?

7   A.   I did not produce any subscriber lists for mmqb.io because

8   mmqb.io is not related to MMQB, Inc. and is not a successor

9   entity.

10  Q.   Sir, mmqb.io is a website, correct, not an entity?

11  A.   There is a website at the address of mmqb.io, that is

12  correct.

13  Q.   Okay.  And the website at mmqb.io is the website used by

14  the Monday Morning Quarterback, correct?

15  A.   It is used by the Monday Morning Quarterback IO, that is

16  correct.

17  Q.   What do you think IO means sir?

18  A.   In out.

19  Q.   So do you think that that is a legal entity?

20  A.   I never claimed it was a legal entity.

21  Q.   Okay.  So the Monday Morning Quarterback, you subscribe to

22  the Monday Morning Quarterback by going to its website at

23  mmqb.io, correct?

24  A.   Correct.

25  Q.   Okay.  Did you -- did you provide an advertisers list in

Wolf - examination

1   response to the citation?

2   A.   Again, it was clear that that was referring to MMQB, Inc.,

3   and I do not have anything.

4   Q.   Actually, it's clear that it's the opposite.  So what did

5   you do to look for documents including the advertiser list for

6   the Monday Morning Quarterback?

7   A.   Okay.  There is no advertiser list for the Monday Morning

8   Quarterback IO.

9   Q.   Does it use -- does it use -- does the Monday Morning

10  Quarterback use software that includes a list of its

11  advertisers?

12  A.   No.

13  Q.   How does it know who is subscribing and advertising?

14  A.   It has a -- there's a software, a SAS product that takes

15  care of all the fulfillment of the advertising and e-mailing

16  of the newsletter.  Advertisers purchase basically online

17  their advertising.

18  Q.   So --

19  A.   There's no document produced, and there's no contract, per

20  se.

21  Q.   So you could produce a list of the entities that advertise

22  with the Monday Morning Quarterback today?

23  A.   I could produce a list of the advertisers who advertise

24  with mmqb.io, yes, and I will be happy to.

25  Q.   Did you -- and you could produce -- but you haven't?

Wolf - examination

28

1    A.  Well, I think we're a little confused on which MMQB we

2    were talking about.

3    Q.  Do you -- did you -- what legal entities are you related

4    to or affiliated with, if anyone?

5    A.  As in shareholder?  As in --

6    Q.  Related -- you keep talking about mmqb.io as if it was a

7    legal entity, and --

8    A.  It's not a legal entity.

9    Q.  -- it's not.  So I'm trying to figure out why you're

10   saying that.

11   A.  None.  MMQB is me.

12   Q.  Okay.

13   A.  I am -- I am the OG.  I am --

14   Q.  And you could --

15   A.  -- mmqb.io.

16   Q.  And you could produce a list of the subscribers to the

17   Monday Morning Quarterback?

18   A.  It's a little more complicated than that, but maybe.

19          I will also add that if you are requesting a

20   subscriber list to mmqb.io not being a successor entity, I

21   will be glad to provide that.

22   Q.  Could you take a look at request No. 32, please.  So we're

23   talking about Exhibit 1, page 11, request No. 32.

24          You didn't produce any documents in response to that,

25   did you?

1  A.  You asked for documents to the judgment debtor and the

2  successor entity.  And, again, mmqb.io is not a successor

3  entity, so that is why there were no documents.

4  Q.  Sir, the successor entity was defined as any person or

5  entity succeeding the judgment debtor as publisher of the

6  Monday Morning Quarterback, including the latest MMQB issues

7  identified on the website located at mmqb.io.

8  A.  Mm-hmm.

9  Q.  Did you -- did you see that?

10  A.  Yes.

11  Q.  Okay.  And, in fact --

12  A.  It's not a successor entity.

13  Q.  In fact, what documents exist related to the entity which

14  publishes the Monday Morning Quarterback today?

15  A.  As I provided, there's an entity, the -- not an entity --

16  the d/b/a, registration in Florida.  The bank records.

17  Q.  You're saying you provided that?

18  A.  Yes.

19  Q.  Where was that?

20  A.  It was in your packet.

21  Q.  Could you -- could you go to Exhibit 11 and show us that?

22  Where -- where do you think you produced that?

23  A.  Well, you pulled it off -- you have the registration.

24  Q.  Yes.  I understand that we did research with the Florida

25  Secretary of State.

Wolf - examination

1   A.   I did not provide it because you already had it.  You

2   already showed it to me on the Zoom call.

3   Q.   We didn't show it to you before your citation, correct?

4   A.   You showed it to me on the Zoom call.

5   Q.   Yes, I understand.

6   A.   You had it, and you held it up.  And you said, right here

7   we have your d/b/a that you're doing business as the Monday

8   Morning Quarterback in the state of Florida.

9   Q.   And you did not produce it before we showed it to you at

10  your citation, correct?

11  A.   Because you already had it.  I'll be happy to produce it.

12  This is -- but you already have it so I'm curious to why you

13  don't realize you have it.

14  Q.   Request No. 33 asks for all documents which refer or

15  relate to the relationship between the judgment debtor or its

16  successor entity as defined therein and you during the

17  relevant period.

18       You didn't produce any documents in connection

19  with --

20  A.   What exhibit number is this?

21  Q.   We're on Exhibit 1, request No. 33, it's on page 11.  It's

22  the request below the one you were just talking about.

23  A.   Yes.  I have no documents related to the judgment debtor,

24  and I don't know of any successor entity, that is correct.

25  Q.   But you know that you're the person publishing the Monday

Wolf - examination

1  Morning public -- Monday Morning Quarterback now, right?

2  A.  I published a product, a newsletter, which the other one

3  was not, and a completely different publication.

4  Q.  So what -- did you produce any -- have you produced any

5  documents other than Exhibit 11?

6  A.  I produced all the bank statements showing all the income

7  and expenses flowing in and out of mmqb.io.

8  Q.  You haven't produced any documents other than those in

9  Exhibit 11, correct?

10 A.  Those -- I produced my tax returns which shows the income

11 from mmqb.io.  And as far as I know, I am not aware of any

12 other documents that I have in my possession.

13 Q.  So the question was you haven't produced any documents

14 other than those in Exhibit 11, correct?

15 A.  Other than the ones I just mentioned.

16 Q.  Those are part of Exhibit 11.  So the question remains,

17 you haven't produced any documents other than those in

18 Exhibit 11, correct?

19 A.  There were no other relevant documents, that is correct.

20 Q.  So let's go to Exhibit 11 and start to take a look at a

21 few of the documents.  It's in volume 2.  Start with 11A, page

22 1.

23         Do you see it?

24 A.  Yes.

25 Q.  And is that the first account statement for the account

Wolf - examination

1   number 665352511 in your name at an address of 320 Central

2   Avenue, Unit 141, in Sarasota, Florida?

3   A.   That is correct.

4   Q.   It appears that the first deposit was November 9th of

5   2020, correct?

6   A.   That is correct.

7   Q.   In fact, the trustee recorded the judgment entered in this

8   case in Florida on October 23, 2020, correct?

9   A.   I have no idea what the trustee did.

10  Q.   So two weeks, or approximately two weeks after the

11  judgment entered in this case was recorded in Florida which is

12  where you were living, you opened an account in your name and

13  started doing business as MMQB, correct?

14  A.   I opened an account in my name doing business as mmqb.io

15  on that date, that is correct.

16  Q.   Well, when you say doing business as mmqb.io, let's --

17  where do you get that?

18  A.   Where do I get what?

19  Q.   IO.  I've asked before, do you think that's a legal

20  entity?

21  A.   I said it wasn't a legal entity.

22  Q.   I'm sorry.  What?

23  A.   I said it was not a legal entity.

24  Q.   Okay.  So you were doing business as MMQB, correct?

25  A.   Correct.

Wolf - examination

1   Q.   Okay.  And I would ask you to take a look at Exhibit 13,

2   please, which is another record from the Florida Department of

3   State which reflects that in January of 2020, Scott Wolf was

4   doing business under the fictitious name MMQB, correct?

5   A.   I have never seen this document before.

6   Q.   Well, in fact, you were living with Scott Wolf, right?

7   A.   Correct.

8   Q.   And you knew he was doing business under the fictitious

9   name MMQB, correct?

10  A.   That is not correct.

11  Q.   You didn't -- you didn't talk to him about the business?

12  A.   No, I did not.

13          It seems odd that the state of Florida --

14          MR. DAWSON:  May I approach the witness?

15  BY THE WITNESS:

16  A.   -- would have granted me the same fictitious name.

17  BY MR. DAWSON:

18  Q.   No.  It was for before yours, correct, when you look at

19  the date?  So Scott Wolf was doing business under the

20  fictitious name MMQB until the judgment was entered in

21  Florida?

22  A.   I have no idea what Scott Wolf was doing.

23     (Unreportable crosstalk.)

24          THE COURT:  I'm sorry.  We can't speak over each

25  other.

1          MR. DAWSON:  Sorry.

2          THE COURT:  Go ahead and finish your question.

3    BY MR. DAWSON:

4    Q.  So, in fact, Scott Wolf was doing business as MM -- under

5    the fictitious name MMQB in January of 20 -- 2020 until the --

6    until the judgment was recorded in Florida, correct?

7    A.  I have no idea.

8          MR. DAWSON:  May I approach?

9          THE COURT:  Yes.

10   BY MR. DAWSON:

11   Q.  Sir, I'm handing you what we will mark as Exhibit 14 for

12   identification.

13         MR. DAWSON:  And, Judge, I have a copy for you also.

14   BY MR. DAWSON:

15   Q.  And that, in fact, reflects that the judgment in this case

16   was registered in Florida on October 20th of 2020, correct,

17   Mr. Wolf?

18   A.  What was the question again?

19         MR. DAWSON:  Could I bother the court reporter to

20   read it back, Your Honor?

21     (Record read.)

22   BY MR. DAWSON:

23   Q.  And I misspoke.  I meant to say October 23rd, Mr. Wolf.

24   A.  This purports to show some MMQB business, not my MMQB

25   business, yes.

Wolf - examination

35

1    Q.   But the question was the judgment entered in this case was

2    recorded in Florida on October 23rd of 2020, correct?

3    A.   That's what it says.

4    Q.   And then if you go to -- back to Exhibit 4C, the document

5    which you insinuated you produced but we actually did, it

6    reflects that you registered to do business under the

7    fictitious name of MMQB in Florida on November 4, 2020,

8    correct?

9    A.   I'm glad you received it, yes.

10   Q.   And you open an account at Chase Bank in your name, right?

11   A.   With my name doing business as, yes.

12   Q.   Actually the account is just in your name personally,

13   correct?  Your tax returns are what reflect --

14   A.   The --

15   Q.   -- that you're doing business as MMQB.

16   A.   Why it does not say d/b/a is a Chase thing, I don't know,

17   but that's what the account shows.  This was opened, yes,

18   MMQB.

19   Q.   So every account statement that you produced says it's

20   Michael Wolf, 320 Central Avenue, Unit 141, Sarasota, Florida,

21   correct?

22   A.   Correct.

23   Q.   Doesn't reflect any mention -- well, okay.

24         So let's take a look at the statements.  In fact,

25   Mr. Wolf, these statements beginning on November 6 of 2020 and

Wolf - examination

36

1   going through July 31st of 2024 are the account into which all

2   the revenue from the Monday Morning Quarterback was placed,

3   correct?

4   A.   All revenue related to mmqb.io, the newsletter, that is

5   correct.

6   Q.   So, you know, I would ask you to answer the question,

7   Mr. Wolf.   And, once again, there's no mmqb.io.   So I'm just

8   trying to make sure that the Monday Morning Quarterback

9   publication put all of its income into the account statements

10  that you produced and there aren't other statements you didn't

11  produce?

12  A.   There are no other statements I didn't produce, and all of

13  that income represents the income from the newsletter at

14  mmqb.io.

15  Q.   Okay.   So the Monday Morning Quarterback publication that

16  was using the website mmqb.io?

17  A.   Correct.

18  Q.   The first of many entries reflects a checking account with

19  the last four 7880.   Whose account is that?

20  A.   That's my personal account.

21  Q.   So you have a different account in your name other than

22  the one you produced?

23  A.   That is correct.

24  Q.   And where is that account, at what bank?

25  A.   Chase.

Wolf - examination

1   Q.  The deposits in large part are made by a name called -- of

2   Stripe, and they identify the entity, although not yet, but

3   they will as MMQB.  Does Stripe provide a technology platform

4   that allows merchants selling goods or services online or

5   through a mobile device to accept credit card payments?

6   A.  Yes, to my knowledge they do, yes.

7   Q.  And merchants register for an account by providing

8   information about the business and its principals as well as

9   standard contact and banking information, correct?

10   A.  Correct.

11   Q.  And it's the merchants who have control over the card

12   information provided to Stripe, correct?

13   A.  Not correct completely.

14   Q.  How so since that's what Stripe says?

15   A.  The fulfillment system that I used has their own Stripe

16   system that automatically deposits the money when subscribers

17   subscribe to the newsletter.  So I am not --

18   Q.  I don't --

19   A.  -- privy to those in granular -- in a granular way.

20   Q.  How does that differ from what Stripe says that they do?

21   I didn't understand.

22   A.  Stripe has APIs that allow other entities, in this case

23   membership companies and so on and so forth, to use their API

24   to connect to their credit card terminals, their credit card

25   system, and charge out.  So, in fact, the credit card

Wolf - examination

1  chargeouts in most cases are through fulfillment company, not

2  through me personally.

3  Q.  I still don't know how that differs from what was said,

4  but the point is that the Stripe -- all Stripe deposits are

5  deposits related to the Monday Morning Quarterback

6  publication, correct?

7  A.  Yes.

8  Q.  Because the subscribers and advertisers use Stripe to pay

9  you d/b/a MMQB, correct?

10  A.  More or less, yes.  Not everybody pays by credit card.

11  Q.  Oh, I didn't ask that.  I said when we see the Stripe,

12  that's what happens, right?

13  A.  That is correct.

14  Q.  And we will see a few deposits that aren't using Stripe,

15  but by -- the great majority pay through Stripe, correct?

16  A.  Correct.

17  Q.  And where it says -- on the Stripe transactions where it

18  says the individual name, it's MMQB.

19          Do you see that?

20  A.  What exhibit are we on?

21  Q.  We're still on the same page, Mr. Wolf.  It's Exhibit 11,

22  page 1.  The bottom, in case you have trouble -- you shouldn't

23  yet, but it's MW CIT00001.

24  A.  Okay.  And what is your question?

25  Q.  The deposits being made by the -- through Stripe by the

Wolf - examination

39

1 advertisers and the subscribers identify the individual name

2 that they're paying is MMQB, correct?

3 A.  Correct.

4 Q.  If you look at page 2, now we're going to withdrawals, so

5 it's the first withdrawal that is on CIT0002, near the bottom

6 of the page.  There's a QuickBooks payment online.  Does the

7 Monday Morning Quarterback use QuickBooks?

8 A.  No, in fact, it does not.

9 Q.  Well, who is using QuickBooks that the Monday Morning

10 Quarterback is paying for?

11 A.  I began a subscription with them, but we do not -- I do

12 not use them.

13 Q.  What do -- what system do you use for the Monday Morning

14 Quarterback?

15 A.  I don't use any accounting system.  I merely take the

16 gross income from this account minus the expenses and report

17 that on my income taxes.

18 Q.  What -- what system do you use to input the income and the

19 expenses?

20 A.  TurboTax.

21 Q.  The third withdrawal is for something called

22 pwpprivacy.com.

23     Do you see that?

24 A.  Yes.

25 Q.  And, in fact, that's a system by which people can pay

Wolf - examination

1  virtually with a card that doesn't identify who it is,

2  correct?

3  A.  Correct.

4  Q.  It shields the card info?

5  A.  That is correct.

6  Q.  And, in fact, you use that extensively, correct?

7  A.  Correct.

8  Q.  The rest of the withdrawals in this first month appear to

9  be personal expenses.  Are they your personal expenses?

10  A.  They are my personal expenses.

11  Q.  So you -- you began using the income from the Monday

12  Morning Quarterback for your personal expenses no later than

13  November of 2020, correct?

14  A.  Correct.

15  Q.  On page CIT0003, the last entry appears to be fees for

16  checks.  Did you get checks for this account?

17  A.  Yes, I believe I did.

18  Q.  You didn't produce any checks, did you?

19  A.  I did not produce any checks.  I only produced Chase, and

20  this is supposed to have a copy of every check that you write.

21  And for whatever reason, there is no -- there are no checks

22  listed here.

23  Q.  Well, we'll get into that a little farther.  What name is

24  on the checks that you purchased for you d/b/a MMQB?

25  A.  MMQB.

Wolf - examination

1   Q.   Does it have your name on it at all?

2   A.   I don't recall.

3   Q.   So then if you look at page 006 and 007, you see that all

4   of the deposits are, in fact, from Stripe; and then in

5   December, you had already gotten $11,000 of deposits, correct?

6   A.   Correct.

7   Q.   If we go to page 0008, the withdrawals, there's -- first

8   it appears there's rent for Arcos Opdaca.  Who's -- who lives

9   there?

10  A.   I do.

11  Q.   And what address was that?

12  A.   320 Central Avenue, Sarasota, Florida.

13  Q.   It then lists a Zelle payment to Peter Wolf.  Who is Peter

14  Wolf?

15  A.   My son.

16  Q.   Why did you pay Peter Wolf $2,500 on December 21st?

17  A.   He provides services as an independent contractor to MMQB.

18  Q.   Well, you already said that you were the only one, but if

19  you're now -- if that -- based on that answer, that new

20  contradictory answer, what services are you saying Peter Wolf

21  provides?

22  A.   He's not an employee.  He provides services.

23  Q.   I didn't ask whether he was an employee before, and you

24  didn't -- and you answered a different way.  But without going

25  back --

Wolf - examination

42

1   A.  You asked if he was associated with MMQB.  He's not

2   associated with MMQB.

3   Q.  So what services are you saying he provides to the Monday

4   Morning Quarterback?

5   A.  He provides news collection services and photographic

6   services when needed.

7   Q.  In fact, he's provided those services to the Monday

8   Morning Quarterback publication for many years, correct?

9   A.  To mmqb.io, yes.

10  Q.  Well --

11  A.  I can't speak to other MMQBs.

12  Q.  So you're saying you don't know whether he provided those

13  services to publishing the Monday Morning Quarterback from

14  2014 through 2020 -- 2020?  I'm sorry.

15  A.  I don't know.

16  Q.  He's your son?

17  A.  Correct.

18  Q.  No one told you he was providing those services?

19  A.  Pardon?

20  Q.  Did no one tell you he was providing those services for

21  any of those years?

22  A.  I have no idea what he provides.

23  Q.  If we take a look at page 0013.  We see that the deposits

24  related to the Monday Morning Quarterback publication in

25  January of 2021 were over $20,000, correct?

Wolf - examination

1  A.  Correct.

2  Q.  And if we go to the next page, 0014, there's a

3  withdrawal -- there's a Quickpay with Zelle to Peter Wolf for

4  a thousand dollars.  Why is that number not the same as the

5  prior number?

6  A.  It depends on how much available cash there is to pay him.

7  Q.  Does he --

8  A.  And what he has done that month as far as services.

9  Q.  Does he have an agreement as to how -- how he's supposed

10  to be paid?

11  A.  No.

12  Q.  None whatsoever?

13  A.  None.

14  Q.  He pays whatever you choose to pay him?

15  A.  Correct.

16  Q.  When it shows transfers to 7880, still on page 0014, a

17  third of the way down, it shows a thousand, thousand, 2,000,

18  1500, 2,000.  Those are payments to you, to a different

19  checking account that you have?

20  A.  Correct.

21  Q.  If we can go to page CIT0018.  In addition to the similar

22  withdrawals to -- for Peter Wolf and for your rent, there's an

23  FPL Direct Debit that appears to go to Scott Wolf.  Did you

24  pay Scott Wolf $130.25 in February of 2020 -- 1?  I'm sorry,

25  '21?

1  A.  No, the electric in that space was in Scott Wolf's name.

2  And FPI was Florida Power and Light.  The electricity is in

3  his name, was in his name at that location.

4  Q.  So that's utilities for where you resided?

5  A.  Correct.  Correct.

6  Q.  It's also where Scott Wolf resided?

7  A.  Correct.

8  Q.  So when you pay rent, was Scott Wolf paying the other half

9  of the rent?

10  A.  No.

11  Q.  So you were paying rent and utilities for Scott Wolf in --

12  throughout 2020, 2021 and 2022?

13  A.  Welcome to my life.  Yes.

14  Q.  There continue to be multiple withdrawals to your account

15  ending in 7880.  What were the reasons for those withdrawals?

16  A.  What page are we on?

17  Q.  They are -- they run throughout the documents, but if

18  you -- the one we were on was CIT0018, you're going to look at

19  three of the bottom four, for example.  So where you're

20  transferring money to your other checking account?

21  A.  Correct.

22  Q.  And I'm asking why -- why were you transferring money to

23  your other checking account?

24  A.  I have a separate checking account that I pay certain

25  bills out of.

Wolf - examination

1    Q.   What bills do you pay out of your separate checking

2    account?

3    A.   Well, it depends.  At this point I'm not sure.  But now I

4    pay mortgage and those kind of things out of a separate

5    account.

6    Q.   But your only income is from the Monday Morning

7    Quarterback?

8    A.   Today?

9    Q.   Okay.  We'll start there.

10   A.   I receive income from other publications that I have.

11   Q.   Which publications are those?

12   A.   Planet Golf News.

13   Q.   Planet?

14   A.   Planetgolf.news.  That's it.

15   Q.   How much money have you received in your life from

16   planetgolf.news?

17   A.   Lifetime?

18   Q.   Yes.

19   A.   So far?  Somewhere around $8.70.

20   Q.   You thought that was relevant to bring up to point out

21   that you have other income?

22   A.   Well, I'm hoping it does better than that.

23   Q.   Were you trying to give the impression that you have

24   income other than the Monday Morning Quarterback publication?

25   A.   I was.  And Planet Golf News is another publication that I

1  publish, and I hopefully will be producing revenue.

2  Q.  If you could take a look at CIT0021.  The very bottom,

3  there's a deposit that doesn't come from Stripe for $2,500.

4  And what is that?

5  A.  Most likely an advertiser.

6  Q.  Well, why is there no description whatsoever?

7  A.  I don't run Chase Bank.  I don't know.

8  Q.  And when you say a subscriber or an advertiser, you're

9  talking about a subscriber or an advertiser to the Monday

10  Morning Quarterback?

11  A.  Correct, Monday Morning Quarterback IO, yes.

12  Q.  If you go to CIT28, the bottom deposit is $8,965 in

13  somewhere in Italy.  Is that one of the non Stripe payments

14  from a subscriber and advertiser?

15  A.  Yes, those are SWIFT transfers, correct.

16  Q.  So if you go to CIT32, we start to see that $2,500 deposit

17  again.  It says some type of description.  So middle of the

18  page, May 14th, now says there's a check deposit at 30 -- on

19  3500 South Tamiami in Sarasota, Florida.  Does that refresh

20  your recollection as to what those $2,500 may be from?

21  A.  It's either a subscription or a -- it's most likely an

22  advertiser.

23  Q.  And that would be the same for the bottom entry on that

24  page which would be a check deposit of $9,800?

25  A.  That's advertising, yes.

Wolf - examination

1  Q.  For the Monday Morning Quarterback publication?

2  A.  For Monday Morning Quarterback newsletter publication at

3  mmqb.io, that is correct.

4  Q.  So if you look at page CIT33, there's a spot for checks in

5  the middle.  It says "checks paid."  There's no description.

6  And below it, it says:  "An image of this check may be

7  available for you to view on Chase.com" because it explains

8  that if there's no description, it means the check is there.

9        Why didn't you produce that check or any of those

10  similar checks?

11  A.  I didn't see any when I went on Chase.com.

12  Q.  Did you look?

13  A.  Yes.

14  Q.  So you can't get us check number 1051 or any of the other

15  checks similarly identified in --

16  A.  Apparently not.  I would be happy to look again, but they

17  don't seem to exist.  Why they're not printed on their

18  statements, I have no idea.

19  Q.  If you look at --

20  A.  They used to have images up there.

21  Q.  In fact, I think it says there are images and you just --

22  you can print it off, but you didn't.

23        So if you look at CIT38, there's two deposits, one on

24  6/15 and one 6/23, once again, for 2500, but one is for

25  11,542.

Wolf - examination

1    Just confirming those are advertisers and subscribers

2    to the Monday Morning Quarterback?

3    A.   Yes.

4    Q.   And if you go to page CIT40, now we have payments to The

5    Bainbridge.

6         Is that -- what's The Bainbridge?

7    A.   Bainbridge took over Arcos, the -- at 320 Central Avenue.

8    They purchased the building, changed management.

9    Q.   So without going through all of those, even if it's not a

10   Stripe deposit, it's a deposit for subscribing or advertising

11   in the Monday Morning Quarterback?

12   A.   Correct.

13   Q.   If you go to CIT53, there's a Zelle payment to Radish 360.

14   It's small, but as you know, Radish 360 was an entity in the

15   underlying -- talked about in the underlying case.

16        Why are you paying Radish 360?

17   A.   I owe Radish 360 money that was I guess you would say

18   loaned to me to for rent in Chicago.

19   Q.   Who loaned money to you?

20   A.   Radish 360.

21   Q.   Who are the principals of Radish 360?

22   A.   To the best of my knowledge, Caren Baltasi.

23   Q.   How much money did she loan you?

24   A.   In her telling, $10,000.

25   Q.   Do you agree?

Wolf - examination

49

1   A.  Well, that's a complicated question.  I was not in a

2   position to disagree with her.

3   Q.  Why is that?

4   A.  Well, we had a relationship, and I was not going to do

5   anything that would interrupt that relationship.

6   Q.  So all the payments to Caren Baltasi later in the

7   statements for $500 a month, what were -- were those for the

8   $10,000 loan?

9   A.  Those were paybacks for the loan, correct.

10  Q.  On page CIT64, there's -- looks to be a withdrawal of

11  1,647 to the IRS.

12          Whose taxes were you paying?

13  A.  That was my personal taxes.

14  Q.  You being MMQB?

15  A.  Correct.

16  Q.  If you go to page CIT72, on December 22nd, there's a

17  deposit from AIS.

18          Is that a subscriber or advertiser?

19  A.  It's an advertiser.

20  Q.  Why do advertisers or subscribers not use Stripe?

21  A.  I prefer they not use Stripe because I have to pay

22  4 percent.

23  Q.  So you asked them not to?

24  A.  I prefer they ACH.

25  Q.  Page CIT97, there's a check for $5,000 you didn't print

Wolf - examination

50

1 out.  Is it -- do you know what that was for?

2 A.  Yes, that was for I believe purchase of an automobile,

3 part of -- a down payment, partial down payment for an

4 automobile.

5 Q.  What type of automobile for whom?

6 A.  That was for me.  It was a BMW Z4.

7 Q.  New?

8 A.  Brand new.

9 Q.  And you used the proceeds from the Monday Morning

10 Quarterback publication to purchase it?

11 A.  I used the proceeds from the Monday Morning Quarterback

12 newsletter at .io, yes.

13 Q.  How much did you purchase it for?

14 A.  The sales price was $55,000.

15 Q.  And you did that in summer of 2022?

16 A.  I think it was 2022.

17 Q.  Do you still have the vehicle?

18 A.  No.

19 Q.  What did you do with it?

20 A.  I traded it in.

21 Q.  For what?

22 A.  Another car.

23 Q.  What kind?

24 A.  BMW.

25 Q.  How much did it cost?

Wolf - examination

51

1   A.  It doesn't cost anything.  I leased it.

2   Q.  Okay.  What are the monthly lease payments?

3   A.  1200 and something dollars.

4   Q.  And you pay those lease payments out of the income of the

5   Monday Morning Quarterback publication?

6   A.  That is my only source of income pretty much, yes.

7         THE COURT:  Mr. Dawson, what we're going to do is

8   take a ten-minute bio break and we'll resume.  You'll have

9   until 5:00.

10         MR. DAWSON:  Thank you.

11         THE COURT:  All right.  We can take a ten-minute

12   break.  The restroom is out in the hall.

13    (Recess at 3:26 p.m., until 3:38 p.m.)

14         THE COURT:  All right.  Mr. Wolf, you remain under

15   oath.

16         You may proceed.

17         MR. DAWSON:  Judge, before we do, I just have one

18   question.

19         So there are -- we had citation proceedings in

20   Florida against Scott Wolf, and there may be additional

21   parties.  I wouldn't want a witness to be on the line without

22   knowing it.  Is there a way we can -- if someone is on the

23   line that we could know who that is or --

24         THE COURT:  Yes.

25         How many people do we have on the line, Alberta?  I

Wolf - examination

1    wasn't aware we had anyone.

2              THE CLERK:  We have three callers on the line.

3              THE COURT:  The individual whose phone number ends in

4    0873, could you identify yourself, please.

5              We're not hearing a response from that individual.

6    Your microphone is on mute.

7              All right.  We have another individual, the last 4 --

8    or is that 4800, Alberta?

9              Can you identify yourself, please?

10             All right.  Again, we're not receiving any response

11   from that caller.

12             We have one other caller who would have a different

13   phone number than the two that I've just indicated.  Could you

14   identify yourself, please.

15             MR. LEWIS:  Your Honor, my name is Edward Lewis.

16             THE COURT:  And are you a potential witness in this

17   matter, Mr. Lewis?

18             MR. LEWIS:  I don't know, Your Honor.  Possibly.  But

19   not in the Florida matter.  I'm familiar with the facts and

20   current and prior proceedings, Your Honor.  As far as I know,

21   I am not scheduled to be nor, have I been asked to be a

22   witness.  So I don't see any issue there.

23             MR. DAWSON:  We don't have an objection to Mr. Lewis

24   listening.

25             I am concerned the two other people didn't identify

Wolf - examination

53

1   themselves.

2            THE COURT:  All right.  We have --

3            MR. LEWIS:  Your Honor?

4            THE COURT:  Yes.

5            MR. LEWIS:  Perhaps I can help you with that.

6            THE COURT:  Yes, please.

7            MR. LEWIS:  All right.  I think you mentioned 0873.

8            THE COURT:  Yes.

9            MR. LEWIS:  I believe that phone number belongs to

10  Elizabeth Wolf who is Mr. Wolf's ex-wife and the largest

11  single creditor in this matter.

12           And the other number may belong to Mr. Wolf's sister

13  who is also --

14           THE WITNESS:  It's a family affair.

15           THE COURT:  Do you expect any of those individuals to

16  be witnesses, Mr. Dawson?

17           MR. DAWSON:  No, Judge.

18           THE COURT:  All right.  Then we'll proceed.

19           MR. LEWIS:  Thank you, Your Honor.

20           THE COURT:  If anyone else joins, Alberta, let me

21  know.

22           MR. LEWIS:  Excuse me, Your Honor.  One other thing.

23  I'm sorry.

24           I've previously been threatened by Mr. Wolf which is

25  why I'm not there in person today.  If there's a way to do it,

Wolf - examination

54

1    I would respectfully request that you instruct Mr. Wolf to not

2    engage in any further threats or physical assault on me which

3    he has done on me in the past.  In fact, he was ordered by the

4    bankruptcy court judge to have a U.S. marshal present to

5    protect me at one point.

6              THE WITNESS:  What?

7              THE COURT:  All right.  Mr. Lewis, I'm not going to

8    enter any such order at this juncture based on the information

9    that's available to me.

10             All right.  Mr. Dawson, you may proceed.

11             MR. DAWSON:  Thank you.

12             THE WITNESS:  Sociopath.

13   BY MR. DAWSON:

14   Q.  So if you could go to CIT137, Mr. Wolf.  It appears that

15   around this time in October 2022, most of the withdrawals are

16   described as privacy comsec.

17             What is that, Mr. Wolf?

18   A.  That's a -- you asked that question earlier.  That's

19   virtual credit cards that you create so that people cannot

20   hack into your account.

21   Q.  So how many credit cards are there that you use?

22   A.  Hundreds.

23   Q.  You have hundreds that you use?

24   A.  I have created hundreds of virtual credit cards.  Anytime

25   I make a purchase online, I create a virtual credit card that

Wolf - examination

1    can't be hacked, that's correct.

2    Q.   And by creating hundreds of virtual credit cards, it

3    precludes us from seeing the information, or at least some of

4    the information regarding the withdrawals beginning in the

5    fall of 2022, correct?

6    A.   I don't know whether it's printed whatever they produce.

7    I have no idea.

8    Q.   And, in fact, the judgment order in this case which

9    affirmed the findings of fact and conclusions of law and

10   entered a final judgment against MMQB as well as entered a

11   judgment in favor of the appellee trustee in this case was

12   entered in September of 2022, correct, Mr. Wolf?

13   A.   Are you referring to this document?

14   Q.   No, sir.

15   A.   What document are you referring to?

16          THE COURT:  Mr. Dawson, let me suggest, that's a

17   matter of record.

18          MR. DAWSON:  Very well.

19          THE COURT:  We don't need to be spending time

20   confirming what is evident from the court records in this

21   matter.

22          MR. DAWSON:  Understood.

23   BY MR. DAWSON:

24   Q.   Could you go to CIT156, Mr. Wolf.  Specifically on

25   January 9th, there are three withdrawals that appear to be

1    payments to the United States District Court.

2            Do you see that?

3    A.   Yes.

4    Q.   And, in fact, those were payments for the appeal made by

5    MMQB, Inc. and others in this case.

6            Is that correct, Mr. Wolf?

7    A.   I am the other.  That is correct.

8    Q.   So you used funds received from the Monday Morning

9    Quarterback publication to pay for the appeal of MMQB, Inc.?

10   A.   I used it to pay for the appeal of the denial of my

11   discharge.

12   Q.   There was also an appeal by MMQB, Inc., correct, Mr. Wolf?

13   A.   I have no idea what MMQB, Inc. did.

14   Q.   Mr. Wolf, that money was for the tran- -- for the dockets

15   of -- including the appeal made by MMQB, Inc., correct?

16   A.   I do not know.

17   Q.   If you go to page CIT179.  On April 24th, there's a

18   withdrawal of $10,000.

19           What was that for?

20   A.   That was for a down payment escrow for the purchase of a

21   residence.

22   Q.   So, Mr. Wolf, the -- shortly after the alias citation to

23   discover assets that brings you here today was issued on

24   April 7th of 2023 and you were served on April 11th of 2023,

25   you used $10,000 to purchase a home in Florida?

Wolf - examination

1  A.   Correct.

2  Q.   And you used money from the Monday Morning Quarterback

3  publication?

4  A.   I've used money from the Monday Morning Quarterback

5  newsletter at mmqb.io, that is correct.

6  Q.   If you'd go to page CIT186, please.  Now we're talking a

7  little more than a month after you were served with the

8  citation, you actually appear to have closed on a purchase of

9  real estate in Florida and paid $147,641.71; is that correct?

10  A.   That is correct.

11  Q.   Is the title to that residence -- that real estate in your

12  name?

13  A.   Yes.

14  Q.   And the proceeds came from the revenue generated by the

15  Monday Morning Quarterback publication?

16  A.   Came from the revenue generated by my writing a newsletter

17  every week called MMQB at mmqb.io, correct.

18  Q.   Let's finish with Exhibit 11F -- or 11 -- and let's

19  start -- let's draw your attention to Exhibit 11F.  What is

20  that?

21        Well, let me ask you this:  Is that a true and

22  correct copy of the tax returns you filed with the United

23  States Government for the year 2020?

24  A.   Yes.

25  Q.   And on page CIT306, it reflects profit or loss from a

Wolf - examination

58

1   business for 2020.

2           Do you see that?

3   A.   Yes.

4   Q.   It lists the business name as Michael Wolf d/b/a MMQB.

5           Do you see that?

6   A.   Yep.

7   Q.   And, in fact, in 2021, you once again filed a tax return

8   which included profit or loss from the business that you say

9   is Michael Wolf d/b/a MMQB, correct?  Would you like some help

10  with the page?

11          Why don't we go to Exhibit 11G, please.  Why don't we

12  start with the question is that a true and correct copy of the

13  tax return you filed with the United States Government for the

14  year 2021?

15  A.   Yes.

16  Q.   If you go to page CIT325, once again, you list the

17  business income from Michael Wolf d/b/a MMQB, correct?

18  A.   Correct.

19  Q.   How did you calculate that $19,229?

20  A.   Subscription revenue is accounted for differently because

21  it's accrued.  So in any -- let's say year one, if you

22  received a thousand dollars, but it was for a subscription for

23  a year and that came -- let's say we started in June, only

24  $500 of that would be accrued in that current year.

25  Q.   So is that -- why don't we take a look at page CIT321

Wolf - examination

1   which is just before that.  That's the schedule C for profit

2   or loss from business.

3   A.  Mm-hmm.

4   Q.  Do you see that?

5   A.  Yes.

6   Q.  And you prepared -- you prepared this document yourself?

7   A.  Yes.

8   Q.  And it's true and correct?

9   A.  Yes.

10  Q.  When we look -- when you look at page CIT321, it names you

11  as the proprietor and the business name as Michael Wolf d/b/a

12  MMQB, correct?

13  A.  Correct.

14  Q.  Now, then it shows gross receipts of $138,606, but

15  obviously the bank statements that we saw reflect much more

16  income than that, correct?

17  A.  Correct.  That accrual is carried forward to the next

18  year.

19  Q.  So even though the Monday Morning Quarterback had revenue

20  of well over $200,000 in 2021, you're saying you only listed

21  138,000 in gross receipts because of the subscription accrual

22  you just mentioned?

23  A.  Because of the accrual on the accounting, a certain

24  percentage is carried forward every year, and then the

25  previous year's is picked up.

Wolf - examination

1    Q.   That same page lists office expenses of $40,520.

2         What is that for?

3    A.   Transportation, traveling, all kinds of things.

4    Q.   So are you saying that that -- that 40,000 includes line

5    24 which is the travel for $6,184?

6    A.   I don't know what it includes.  It includes whatever -- I

7    went through the list of expenses, and that's what it came out

8    to.

9    Q.   You didn't produce the list of expenses to us, did you?

10   A.   Well, there is no particular list.  It's when I'm

11   producing the QuickBooks and I go through line by line, I

12   write it down --

13   Q.   Okay.  Now --

14   A.   -- in QuickBooks.

15   Q.   Now I don't understand your answer because you previously

16   said you don't use QuickBooks.

17   A.   I'm sorry.  TurboTax.  You're correct.

18   Q.   So you don't use QuickBooks for MMQB, or you do?

19   A.   I have used QuickBooks for MMQB, but there were problems

20   with it so I discontinued using it.  I probably will go back

21   to it.

22   Q.   What year did you use QuickBooks for MMQB?

23   A.   For mmqb.io, I used it -- I don't recall.  One of those

24   years.

25   Q.   Meaning one of the years between 2020 and 2023?

Wolf - examination

1    A.   Correct.

2    Q.   And yet you didn't produce any QuickBook records to us,

3    did you?

4    A.   There are no QuickBook records per se because the

5    QuickBooks that I used had lost a significant amount of the

6    data that was online.  So I manually did it.

7    Q.   Sir, QuickBooks produces reports, correct?

8    A.   Theoretically, yes.

9    Q.   And you didn't provide any reports to us from QuickBooks,

10   did you?

11   A.   I have no reports.

12   Q.   You could -- but QuickBooks would allow you to print

13   reports, correct?

14   A.   If I had that subscription, they probably would.

15   Q.   This CIT321 lists contract labor of $51,532.  Who

16   received -- who did -- who received the $51,532?

17   A.   Peter Wolf.

18   Q.   I ask you to go to Exhibit 11H.  Please confirm that

19   that's a true and correct copy of the tax return you filed

20   with the federal government for the year 2022.  You didn't

21   produce a false one to us, did you?

22   A.   That looks correct.

23   Q.   So if we go to page CIT335, it appears to reflect gross

24   receipts for MMQB of over $300,000 for 2022, correct?

25   A.   Correct.

Wolf - examination

1   Q.  And that would still be less than on the bank statements

2   but would involve the accrual you mentioned?

3   A.  Correct, the previous years, 2021 accrued amount was added

4   to it, and then half of the amount of whatever the sales were

5   in 2022 were carried to 2023.

6   Q.  Have you filed for 2023 yet?

7   A.  I've got three and a half more weeks.

8   Q.  So is the answer no?

9   A.  No.

10  Q.  The -- that same page reflects depreciation of over

11  $18,000.  What are you depreciating?  What asset are you

12  depreciating?

13  A.  Computers, office furniture.

14  Q.  Where is the office furniture located?

15  A.  In my house.

16  Q.  When did you get -- buy the computers?

17  A.  2022.

18  Q.  It also lists $77,144 in contract labor.  Who received

19  that?

20  A.  Peter Wolf.

21  Q.  Anyone else?

22  A.  Nope.

23  Q.  I believe you said you didn't perform any services for the

24  Monday Morning Quarterback from the years 2014 through 2019;

25  is that correct?

1    A.  The Monday Morning -- I produced -- I didn't perform any

2    services for anything published by MMQB, Inc. or Zigzag, Inc.

3    or ZZC, Inc. during those years, that is correct.

4    Q.  Did you perform any services related to the Monday Morning

5    Quarterback publication from 2014 through 2019?

6    A.  No.

7    Q.  What did -- what was your source of income from 2014

8    through 2019?

9    A.  Social Security and loans from Radish, Incorporated.

10   Q.  Anyone else?

11   A.  No.

12   Q.  Scott Wolf didn't loan you any money?

13   A.  No.

14   Q.  ZZC didn't loan you any money?

15   A.  No.

16   Q.  So let's take a look at Exhibit 7.

17          Actually, before we go -- before we do that, how much

18   do you receive in Social Security a month?

19   A.  Approximately $2,700.

20   Q.  What was -- what was your rent for the years 2014 through

21   2019?

22   A.  Approximately $2,700.

23   Q.  And you're claiming that Scott Wolf took over the Monday

24   Morning Quarterback publication from 2014 through 2019?

25   A.  I wouldn't characterize it as took over.  He started his

Wolf - examination

1  own publication.

2  Q.  Well, his publication was obtainable at mmqb.com, correct?

3  A.  I don't know.

4  Q.  You have no idea?

5  A.  I have no idea.

6  Q.  You never asked him?

7  A.  Didn't ask, didn't care.

8  Q.  This guy you've lived with, he's your son, right?

9  A.  On some days, yes.

10  Q.  You lived with him for the last how many years?  15?

11  A.  Last 12 or so, whatever it comes out to, yeah.

12  Q.  And --

13  A.  Seems longer.

14  Q.  And now let's take a look at Exhibit 7.  What is

15  Exhibit 7?  Mr. Wolf, in fact, it's a promissory note from you

16  to ZZC, Inc., correct?

17  A.  Yeah, I've never seen this before.

18  Q.  Is that your signature on page 3?

19  A.  No, it's not.  It looks a lot like my -- it looks a lot

20  like my former wife's writing, however.

21  Q.  Do you know who prepared Exhibit 7, Mr. Wolf?

22  A.  No, I do not.

23  Q.  Have you ever testified that, in fact, this was -- that

24  you owed ZZC money from -- that they had paid you?

25  A.  I have never seen this before.

1  Q.  And, in fact, you've testified previously that ZZC, Inc.,

2  which is an entity set up by your son Scott Wolf, paid you

3  money, and this was a promissory note to pay it back, correct?

4  A.  Which ZZC, Inc. are we discussing?

5  Q.  Any ZZC, Inc., Mr. Wolf.

6  A.  I'm not familiar with this document.  I cannot say that.

7  I don't know.

8  Q.  I didn't ask you about the document.  I asked if you ever

9  testified before in the manner that I said.  Have you or

10 haven't you?

11 A.  I don't recall.

12 Q.  The due date on the note is January 1st of 2024.

13        Do you see that?

14 A.  Yes.

15 Q.  Have you made any payments under the note?

16 A.  I have never seen the note before, so I'm not familiar

17 with it.

18 Q.  Could you take a look at Exhibit 8, please, Mr. Wolf.

19        What's Exhibit 8?

20 A.  What's your question?

21 Q.  What is Exhibit 8?

22 A.  Purports to be a demand promissory note, state of

23 Washington.

24 Q.  Actually, it's almost 100 pages long, and it's a slew of

25 promissory notes signed by you payable to Scott Wolf, correct?

Wolf - examination

66

A.   Not my name on there correctly or my signature.  I have
never seen any of these.

Q.   Mr. Wolf, did Scott Wolf, your son, pay for your personal
expenses from the Monday Morning Quarterback publication from
the years 2014 through 2019?

A.   Not that I'm aware of.

Q.   Well, if your Social Security was $2,700 and your rent was
$2,700, what did you -- who -- who paid for your food and your
utilities and your car and your daily -- and your medical care
and your expenses?

A.   I sold property that I had, and I had an IRA that I used
to pay for those expenses.

Q.   Which property did you sell?

A.   I sold an automobile.

Q.   Which one is that?

A.   That was a Mazda Miata.

Q.   How much did you get for the Miata?

A.   Approximately $16,000.

Q.   And I'm sorry.  What was the other source of your income?

A.   IRA.

Q.   How much was in your IRA?

A.   I don't recall.

Q.   What's your best recollection?

A.   Maybe $15,000.

Q.   And, in fact, you took that money out I think before the

1    bankruptcy, right?

2    A.   I don't recall.

3    Q.   So you're saying that the Mazda Miata sale of $16,000 paid

4    for all of your medical bills, food, rent, utilities, every --

5    all of your other expenses from 2014 through 2019 and that you

6    didn't receive any money from the revenue of the Monday

7    Morning Quarterback?

8    A.   I did not.  And I used credit cards and had an outstanding

9    balance of around $40,000 during that time.

10   Q.   Now, you told us before you have hundreds of virtual

11   credit cards.  How many hard credit cards do you have?

12   A.   Five.

13   Q.   Five?  Are all of them through Chase?

14   A.   None of them are Chase.

15   Q.   Where are they -- where are they -- who are they with?

16   A.   Capital One, Ally Financial, Barclays, another Capital

17   One, Sunova I think it's called.

18   Q.   And these five credit cards will show all of the money you

19   used to pay for your expenses from 2014 through 2019?

20   A.   Yes.

21   Q.   Okay.  Now, most credit cards don't allow you to carry a

22   balance without making payments for five or six years.  Are

23   these credit cards that do that or no?

24   A.   I made minimal payments.

25   Q.   All right.  So we would like the records for your credit

Wolf - examination

1    cards for the periods 2014 through 2019.  Thank you.

2    A.  I object to that.  If you want to bring an action and ask

3    for that, that's fine.

4    Q.  Mr. Wolf, we'll take that up with the Court if you don't

5    produce them.

6            Have you testified before that you signed the

7    promissory notes that are included as Exhibit 8 and were

8    produced in this case as AG/MW138 through 231?

9    A.  These are clearly not my signature and also not -- I did

10   not sign any of these.

11   Q.  Did Scott Wolf give you this money that's reflected -- I'm

12   sorry.

13           Did Scott Wolf lend you the money that's reflected in

14   these promissory notes?

15   A.  He did not lend me anything.

16   Q.  So if he testified to the contrary, he would not be

17   telling the truth?

18   A.  It's not up to me to decide.

19   Q.  I'd ask you to take a look at Exhibit 9, Mr. Wolf.

20           Have you ever seen that before?

21   A.  I have never seen it, but okay.

22   Q.  Do you know what it is?

23   A.  Appears to be an application for a trademark.

24   Q.  For the Monday Morning Quarterback?

25   A.  That is what it says.

Wolf - examination

1   Q.   It says the owner of the mark was MMQB, Inc.?

2   A.   Right.

3   Q.   Did you pay MMQB, Inc. any money to use the mark Monday

4   Morning Quarterback?

5   A.   When I started mmqb.io in 2020, MMQB, Inc. did not have a

6   trademark, a current trademark.  I checked.

7   Q.   And you didn't pay MMQB, Inc. anything to begin publishing

8   the Monday Morning Quarterback in 20 --

9   A.   MMQB, Inc. did not have a trademark.

10  Q.   I didn't ask about the trademark.

11  A.   So I did not pay anything, that is correct.

12  Q.   I'm asking you a different question.  Did MMQB -- did you

13  pay any money to MMQB, Inc. to begin publishing the Monday

14  Morning Quarterback in November of 2020?

15  A.   No.

16  Q.   I would ask you to take a look at Exhibit 4G, please.

17  This is a report confirming that on October 18, 2022, if you

18  entered the website mmqb.com, you were redirected to mmqb.io.

19           Do you see that?

20  A.   I don't know what this document is.

21  Q.   Do you know why people were redirected for years from mmqb

22  to mmqb.io?

23  A.   Well, A, objection, facts not in evidence.  And I have no

24  idea what this document purports to show.

25           THE COURT:  Are you in tab D, as in delta?

Wolf - examination

1          MR. DAWSON:  No, G.

2          THE COURT:  G.

3          MR. DAWSON:  I'm sorry.  4G --

4          THE COURT:  All right.

5          MR. DAWSON:  -- as in girl.

6    BY MR. DAWSON:

7    Q.   And that wasn't the question, Mr. Wolf.  The question was

8    do you have -- know why anyone who went to the site mmqb.com

9    were redirected to mmqb.io for the first three or actually

10   more years after you claim you started publishing the Monday

11   Morning Quarterback at mmqb.io?

12   A.   No.

13   Q.   In fact, the Monday Morning Quarterback was -- its website

14   was for many years mmqb.com, correct?

15   A.   MMQB, Inc.'s website was --

16   Q.   The Monday Morning --

17   A.   -- mmqb.com?

18   Q.   The Monday Morning Quarterback was published -- or at

19   least you could subscribe and advertise to the Monday Morning

20   Quarterback by going to mmqb.com for many years, probably more

21   than a decade, correct?

22   A.   I'm familiar with that before 2014, yes.

23   Q.   Okay.  So before 2014, while you were still involved with

24   the Monday Morning Quarterback, you could -- people who

25   went -- who were looking to advertise or subscribe or get

Wolf - examination

1    issues of the Monday Morning Quarterback would go to mmqb.com,

2    correct?

3    A.   Correct.

4    Q.   And this was the case from -- beginning when?  22 -- was

5    the 1990s or the early 2000s?

6    A.   Probably 1996.

7    Q.   Okay.  So from 1996 all the way through October 18th of

8    2022, at least anyone who went to mmqb.com would be -- would

9    be able to view the Monday Morning Quarterback website,

10   correct?

11   A.   Incorrect.  I don't have any knowledge of it up to those

12   dates.  I know up to 2014, yes.

13   Q.   Okay.  So you just -- it's not that it's incorrect.  You

14   just -- you're saying you don't know from 2014 on?

15   A.   Correct.

16   Q.   And so -- and you're saying Scott Wolf and his -- the

17   entities that he allegedly created published the Monday

18   Morning Quarterback from 2014 through 2019?

19   A.   If you say so.  I have no idea.

20   Q.   Well, did -- and you never talked to Scott Wolf about it?

21   A.   We have a Chinese wall.  I don't discuss this with him.

22   Q.   I thought you said that subscribers had come to you and

23   told you that the Monday Morning Quarterback wasn't up to

24   snuff anymore?

25   A.   Yes, subscribers did tell me that.

Wolf - examination

1  Q.   Okay.  So you knew that the Monday Morning Quarterback was

2  being published from 2014 through 2019?

3  A.   I suppose.  I have no idea.

4  Q.   And beginning in 2020, shortly after the judgment was

5  recorded in Florida, you started doing business as MMQB, and

6  you created -- and you -- and you, what, obtained a new domain

7  name, mmqb.io?

8  A.   I obtained and began a new business at mmqb.io.  Business

9  was based on an entirely different model than previous MMQBs

10 that I was familiar with.  It is a newsletter, not a PDF

11 publication, not a magazine.  It is simply an e-mailed

12 newsletter, contains entirely different information than MMQB,

13 Inc. I believe was publishing or that MMQB originally was

14 publishing.

15 Q.   So -- so when you advertised that -- in August of 2023

16 that it was the 1,681 issue since 1990, you were false

17 advertising?

18 A.   False advertising.

19 Q.   You did that to deceive the subscribers and advertisers?

20 A.   Yes, and I thank you for pointing that out to me on the

21 Zoom call.  That has all been changed now.  Thank you.

22 Q.   So -- but you prepared the document and you gave it to --

23 what -- you gave it to the NeoCon, correct, to advertise?

24 What's NeoCon?

25 A.   NeoCon is a trade show that's held at the Merchandise

Wolf - examination

1    Mart.

2    Q.  And you provided Exhibit 4A to NeoCon to advertise?

3    A.  No.  No.

4    Q.  What -- what -- where did you advertise?

5    A.  That is -- that document strictly is on mmqb.io.

6    Q.  Okay.  So you put it on mmqb.io.  The -- and when you

7    registered for NeoCon in August of 2023, you -- you registered

8    for MMQB at Michael -- at mw@mmqb.com, correct?

9    A.  Incorrect.  I did not register.  The Merchandise Mart in

10   NeoCon maintains the records from previous years and just

11   prints out your badge reflecting -- they want me there so they

12   print me a badge, and that's what it says on it.

13   Q.  So if you look at Exhibit 4D, please.  Two-thirds of the

14   way down where it says MMQB and identifies you as its

15   representative and your e-mail at mw@mmqb.com, correct?

16   A.  Yes, mmqb.io is a media partner of NeoCon.

17   Q.  Where does that say mmqb.io, Mr. Wolf?

18   A.  People generally understand that that's the website.  MMQB

19   here was referring to my newsletter.

20   Q.  So --

21   A.  They're not confused.

22   Q.  Where does it say it refers to your newsletter, Mr. Wolf?

23   A.  People know me and they know it's my newsletter, that it's

24   written by me.

25   Q.  Who paid -- when did you set up the domain name mmqb.io?

Wolf - examination

74

1   A.   In 2020.

2   Q.   When in 2020?

3   A.   I don't recall.

4   Q.   Who paid for it?

5   A.   I did.

6   Q.   Who hosts it?

7   A.   GoDaddy.

8   Q.   Did you produce any of these documents in response to the

9   citation?

10  A.   The citation didn't ask for the domain registrations

11  of M -- of -- it only asks for -- of a successor entity, and

12  that's not a successor entity.

13  Q.   Mr. Wolf, we've been through that definition of successor

14  entity before.  The question was --

15  A.   Well, apparently not.

16  Q.   The question was did you produce any of those documents in

17  response to the citation.  Yes or no?

18  A.   No.

19  Q.   And you set it up shortly after the trustee's judgment was

20  registered in Florida which is where you were living at the

21  time?

22  A.   I have no knowledge of when the trustee's judgment was

23  registered, in what state whatsoever.

24  Q.   Mr. Wolf, did you produce any correspondence, meaning any

25  e-mails, texts, or letters whatsoever in response to the

Wolf - examination

1  citation?  You didn't, did you?

2  A.  For what citation?

3  Q.  The one you're sitting here today for.

4  A.  No, not that I'm aware of.

5  Q.  In the first citation, you were use -- examination, you

6  were using notes that you refused to turn over.  Where are

7  those notes?

8  A.  The notes that I was using were not -- I was not using any

9  notes, No. 1.

10         No. 2, those pieces of paper were not relevant and

11  did not contain any information concerning this case.

12  Q.  Mr. --

13  A.  It was simply pieces of paper on my desk.

14  Q.  Mr. Wolf, where are the notes?

15  A.  There are no notes.

16  Q.  Mr. Wolf, you testified that there were notes and you

17  refused to produce them over.

18  A.  I didn't testify they were notes.

19  Q.  Where are -- where are those?

20  A.  I said there were notes.  They were not notes that had

21  anything to do with that case, this case.

22  Q.  You didn't produce them, correct?

23  A.  Correct, but I remember them verbatim.

24  Q.  But I'm sorry.  What?

25  A.  I remember what was written on them verbatim.

Wolf - examination

1    Q.  But you refused to tell me or produce the notes, correct?

2    A.  Could you rephrase that question?

3    Q.  You refused to tell me what was on the notes or produce

4    them during your first examination, correct?

5    A.  Over the Zoom call, that is correct.

6    Q.  Could you take a look at Exhibit 6, please.  We're going

7    back.  This is the materials that were on the website when you

8    went to mmqb.com and were redirected to mmqb.io on May 10th of

9    2024.

10          If you look at Exhibit B, that has subscription

11   options.  In fact, those are the same -- first of all, I guess

12   the subscription says it's to the Monday Morning Quarterback,

13   correct?

14   A.  Correct.

15   Q.  It says delivered every Monday morning, correct?

16   A.  Correct.

17   Q.  Has the Monday Morning Quarterback been delivered every

18   Monday morning since 1990 when you started it?

19   A.  Not this Monday Morning Quarterback.

20   Q.  Well, you keep saying that, but is the Monday Morning

21   Quarterback, has it been delivered every Monday from 1990 when

22   you started it until today?

23   A.  Which Monday Morning Quarterback?

24   Q.  They're all the same.

25   A.  You're talking about different objects.

Wolf - examination

1  Q.  They're all the same, Mr. Wolf.

2  A.  They're not the same.

3  Q.  But in any event, have any Monday Morning Quarterback --

4  has there ever been a time when a Monday Morning Quarterback

5  publication wasn't delivered on Monday morning since 1990?

6  A.  Yes.

7  Q.  When?

8  A.  I don't recall.

9  Q.  Pardon me?

10  A.  I don't recall.

11  Q.  What year?

12  A.  Probably in the 2000s, early 2000s or 1990s.

13  Q.  How many times?

14  A.  I don't recall.

15  Q.  Less than two?

16  A.  I don't recall.

17  Q.  So as a practical matter, every Monday morning for the

18  last 24 years, a Monday Morning Quarterback publication has

19  been delivered on Monday morning?

20  A.  A Monday Morning Quarterback, which is totally a different

21  delivery system and e-mail is delivered now.  It is not the

22  same as the Monday Morning Quarterback that was previously

23  delivered.

24  Q.  Mr. Wolf, if you could answer the question though.

25  A.  Well, I don't understand.

Wolf - examination

1   Q.   Has a Monday Morning Quarterback been delivered every

2   Monday morning other than a very small number that you

3   think -- that you don't really recall in -- somewhere in the

4   early 2020s?  Have they been delivered every Monday morning?

5   A.   I -- I can't speak for it.  I didn't publish it for a

6   number of years so I have no idea.

7   Q.   Was -- did the Monday Morning Quarterback offer yearly

8   subscriptions before 2020?

9   A.   It did up until 2014 that I know of.

10  Q.   What was the price?

11  A.   $199.

12  Q.   And it's still $199 as of May 10th --

13  A.   An unbelievable value.

14  Q.   So not even the price has changed?

15  A.   That is correct.  Who else could say that?

16          MR. DAWSON:  Judge, if we could have maybe five

17  minutes, I'm probably coming close to the end for the day.

18          THE COURT:  All right.

19          MR. DAWSON:  Having said that, we are not -- there's

20  significant documents that obviously haven't been produced, so

21  we're not saying that we would be done.

22          THE COURT:  I understand.  We're talking about this

23  hearing.

24          MR. DAWSON:  But for the day.

25          THE COURT:  We'll take five minutes.

Wolf - examination

1          MR. DAWSON:  Thank you, Judge.

2          THE COURT:  If you want to take another restroom

3    break --

4          THE WITNESS:  Yeah.

5          THE COURT:  -- or anything, Mr. Wolf, you may do so.

6      (Recess at 4:30 p.m., until 4:34 p.m.)

7          THE COURT:  Are you ready to resume?

8          MR. DAWSON:  I think so.

9          THE COURT:  I'll remind you again, Mr. Wolf, you

10   remain under oath.

11   BY MR. DAWSON:

12   Q.  When you started publishing the Monday Morning Quarterback

13   on mmqb.io, when was that specifically?

14   A.  2020.

15   Q.  When in 2020?

16   A.  Fall of 2020.  I don't remember the exact date.

17   Q.  Was it the same date that you opened the bank account?

18   A.  It was probably earlier.

19   Q.  Where did you get the -- who did you talk to regarding

20   what you described before as the MM -- as the Monday Morning

21   Quarterback not being up to snuff anymore?

22   A.  People, I would go to the trade show, and they would tell

23   me when is the real Monday Morning Quarterback coming back.

24   Q.  Names?

25   A.  I don't know.  People who know me as the Monday Morning

Wolf - examination

1  Quarterback.  I don't even know these people.

2  Q.  Have you always been associated with the Monday Morning

3  Quarterback?

4  A.  I have been known as the Monday Morning Quarterback, and

5  people have associated me with being the Monday Morning

6  Quarterback over the years.

7  Q.  Since 1990?

8  A.  Correct.

9  Q.  That never changed?

10  A.  People knew that I was not associated with it in -- after

11  2014 because it was an entirely different publication at that

12  point.

13  Q.  Why -- you kept -- you're publishing the Monday Morning

14  Quarterback using the same name, the Monday Morning

15  Quarterback, correct?

16  A.  I checked, and that name was available, that is correct.

17  Q.  Okay.  And it was available, and you didn't pay anybody

18  for it?

19  A.  I did not.

20  Q.  And so the one thing that has been consistent is that the

21  Monday Morning Quarterback has been published from 1990

22  through today.  You're just claiming that somebody else did it

23  from 2014 through 2019?

24  A.  I have no idea what the person from 2014 to 2020

25  published.

Wolf - examination

1   Q.   Where is Scott Wolf today?

2   A.   Is that a philosophical question?  Is that a physical

3   question?

4   Q.   Physical.

5   A.   In Florida.

6   Q.   He still resides with you?

7   A.   He does.

8   Q.   What's his -- what's his e-mail address?

9   A.   I don't know actually.  I don't e-mail him.

10  Q.   What's his phone number?

11  A.   I don't have that either.

12  Q.   Your son that lives with you, you don't know his e-mail

13  address or his phone number?

14  A.   He doesn't e-mail.  As far as phone number, he texts.  I

15  don't know.

16  Q.   And you haven't produced any texts regarding when you

17  allege he stopped publishing the Monday Morning Quarterback

18  and you restarted publishing the Monday Morning Quarterback?

19  A.   Correct.

20  Q.   Correspondence with advertisers, right, you didn't produce

21  any?

22  A.   I didn't bring any in for mmqb.io --

23  Q.   You didn't --

24  A.   -- and I did not have any previous to that.

25  Q.   You didn't produce any related to the Monday Morning

Wolf - examination

1  Quarterback that's published on mmqb.io now?

2  A.  That is correct.  Because MMQB was not a successor entity.

3  Q.  After we -- after we took your citation examination,

4  somebody stopped the link between mmqb.com to mmqb.io.  Do you

5  know who did it?

6  A.  I would suspect Elizabeth Wolf.

7  Q.  Why?  What access would Elizabeth Wolf had -- have to --

8  to that link?

9  A.  She owns Zigzag Corporation.  Zigzag Corporation is listed

10  as the owner of mmqb.com.

11  Q.  What is your e-mail address that you do business with, all

12  the advertisers and subscribers?

13  A.  mwolf@mmqb.io.

14  Q.  Who are the ten biggest advertisers for the Monday Morning

15  Quarterback that you now publish at mmqb.io?

16  A.  I'm not sure there's ten, but AIS, Wanek, Group Lacasse,

17  that Italian company.  It will come to me.  What's the name of

18  that?  Something like Corcraft.  They advertise every week.

19  Allsteel, Landscape Forums, HON Industries.  Another company,

20  Formaspace.  That's the biggest ones.

21  Q.  Who do you deal with at AIS?

22  A.  Their marketing department.

23  Q.  Person?

24  A.  These people contact me once a year.  I don't know.

25  What's their name?  Tracy something.

Wolf - examination

1  Q.  Can you provide a list of the persons and e-mails at those

2  nine advertisers who communicate with you d/b/a MMQB?  As

3  opposed to -- because we're coming up on 5:00 and as opposed

4  to sitting here waiting for you to try to remember the names

5  and e-mails.

6  A.  Was there -- what was the question?

7  Q.  Is it possible for you to provide a list of the names and

8  e-mails at those nine advertisers who you communicate with

9  doing business as MMQB?

10  A.  Doing business with mmqb.io as the newsletter, yes, I can

11  provide those.

12  Q.  How about the subscribers?  Who are the nine biggest

13  subscribers?

14  A.  There are no nine biggest subscribers.  They're all pretty

15  much equal.

16  Q.  They're all pretty much what?

17  A.  Equal.  They're individual subscriptions.

18  Q.  So are the individuals at -- who are employees or

19  affiliated with the advertisers the ones who are also

20  subscribers?

21  A.  Well, that's a difficult question to answer because

22  subscribers, like most people in the country, give out the

23  copies of the Monday Morning Quarterback to literally

24  thousands of people.

25  Q.  Okay.

Wolf - examination

1  A.  So I don't know who those people -- who reads it and who

2  does not read it.

3  Q.  How do you access your e-mails at mwolf@mmqb.io?

4  A.  Through a mail browser.

5  Q.  Did you perform any searches on your mail browser to

6  comply with the citation to discover assets?

7  A.  I do not believe it was required because this is not a

8  successor entity.

9  Q.  So the answer is no, you didn't provide any -- you didn't

10 do any searches?

11 A.  As mmqb.io, I did not do any searches because it's not a

12 successor entity.

13 Q.  Do you have -- do you have an IT -- who would we contact

14 to discuss doing searches of your mail browser?

15 A.  I have no idea.

16 Q.  Do you access your e-mail through any way other than your

17 computer?

18 A.  As in what?

19 Q.  We're going to need to get the correspondence.  We need to

20 do searches of your e-mail.  Is there any reason you couldn't

21 produce your computer to us to have someone do searches on

22 your e-mail?

23 A.  No reason at all.  As long as you're paying.

24 Q.  Paying you mean for the person to do the searches?

25 A.  Correct.

Wolf - examination

1   Q.  Who set up the system that -- the website where -- which

2   has, just as the prior website at mmqb.com had, the choices to

3   go to the QB home -- QB -- go to the home or the features of

4   the subscriptions or place an ad or advertisers or submit the

5   PR, sample issues, those are all the same as they were for

6   people who went to mmqb.com, correct?

7   A.  I don't know.

8   Q.  Well, they were the same in 2014, correct?

9   A.  I don't believe so.

10  Q.  What was different?

11  A.  I don't know.  It was a whole different website.  I have

12  no idea.

13  Q.  It was a website at mmqb.com, correct?

14  A.  Correct.

15  Q.  And on the website, you could -- you could go to the home,

16  correct?

17  A.  I suppose.

18  Q.  And you could subscribe, correct?

19  A.  Yes.

20  Q.  And you could ask to place advertisements, correct?

21  A.  You could get a media kit, yes.

22  Q.  And it had sample issues, correct?

23  A.  I don't believe it had sample issues.

24  Q.  So who set -- who set all this up for you?

25  A.  Which MMQB are we talking about?  2014, 1990, 1996, 2021,

1  which one are we talking about?

2  Q.  The Monday Morning Quarterback when you go to mmqb.io to

3  access it has -- looks very much like, if not the same as, the

4  one when you went to mmqb.com.  Who set up the one that's on

5  mmqb.io?

6  A.  I reject the notion it looks anything similar to it, and I

7  personally set up the IO, mmqb.io.

8  Q.  Do you have IT training?

9  A.  No.

10  Q.  How did you set it up?  What did you use?

11  A.  Squarespace.

12  Q.  What did -- what was used to set -- who set up the prior

13  website at mmqb.com?

14  A.  I have no idea.

15  Q.  Well --

16  A.  Not me.

17  Q.  -- you were in charge of mmqb.com in 2014, right?

18  A.  Scott Wolf probably.

19  Q.  Were you in charge of MMQB -- do you admit to being the --

20  the person in charge of the Monday Morning Quarterback in

21  2014?

22  A.  No.

23  Q.  Who was?

24  A.  Scott Wolf.

25  Q.  How about 2013?

Wolf - examination

1    A.   Scott Wolf.

2    Q.   How long are you saying Scott Wolf was in charge of the

3    Monday Morning Quarterback?

4    A.   Since 2011.

5    Q.   Scott Wolf is the person that the trustee has a judgment

6    for over $2 million against and recorded it in Florida in

7    2020, correct?

8    A.   That seems like a you problem, yes.  Yes.

9    Q.   Okay.

10            MR. DAWSON:  Judge, I don't think I have anything

11   more for today.  We are going to have more, and we are going

12   to -- we would like to do two -- two things that's important.

13            Based on the evidence we have today and just today,

14   which is -- includes the fact that the Monday Morning

15   Quarterback, the evidence that Mr. Wolf is taking all of the

16   revenue and that he's advertised to the world that it's the

17   same one that's been published and it's like over the 1,900

18   issues, we need two things.

19            We would like to renew our motion to compel turnover

20   of the assets which Mr. Wolf obviously took possession of.

21   And it's just a business that he and his son attribute income

22   to different entities and now it's being attributed to him.

23   And so we would like to renew our motion.

24            Secondly, as we asked for in the motion, Your Honor,

25   we would ask to enjoin Mr. Wolf from paying himself or any

1   related entities while the motion is pending.  The citation

2   should have done that, and it should have prohibited

3   transfers.  Mr. Wolf has made the legally unsupportable

4   position that somehow mmqb.io is an entity which it's not.

5   It's a website.  And where the Monday Morning Quarterback is

6   published now and where the judgment, one of the -- more than

7   one of the judgment debtors published the Monday Morning

8   Quarterback on a different website which was redirected to

9   mmqb.io until after Mr. Wolf first sat for his deposition.

10  He's -- he's already taking assets from the Monday Morning

11  Quarterback publication which was property of mmqb.com and

12  Scott Wolf and who Mr. Wolf has admitted mmqb.com and Scott

13  Wolf ran until he mysteriously, without any help and now doing

14  it all on his own, is doing business as MMQB and taking all of

15  the income while -- while the creditor is unable to get the

16  income from the publication, which is the main, if not sole,

17  asset of the judgment -- was of the judgment debtors being

18  Scott Wolf and mmqb.inc.

19         We argued in the complaint that it was a sham.  The

20  bankruptcy judge analyzed it as if those entities were -- were

21  to be given some credence but still found in our favor, as did

22  Your Honor and the Seventh Circuit.  We have spent ten years

23  trying to collect for the creditors of Michael Wolf and him

24  being the individual that fraudulently transferred the

25  business first to ZZC, an entity related to Scott Wolf, and

1    then to mmqb.inc, another entity related to Scott Wolf.   And

2    the only reason a judgment wasn't -- a monetary judgment

3    entered against Michael Wolf was because he was the

4    transferor, not the transferee so the asset went.

5            Well, magically the asset, after we record the

6    judgment in Florida and Mike and Scott Wolf can't have any

7    assets and MMQB, Inc. can't have any assets because the

8    trustee would get them, magically the same publication, the

9    Monday Morning Quarterback, which is now almost 2,000 issues

10   which started in 1990 which was the -- the primary if not sole

11   asset of mmqb.inc, all of its income is now going to Michael

12   Wolf.  And he's using it to buy real estate in Florida for

13   hundreds of thousands of dollars of which he's paid already

14   over 150,000, to pay all of his personal expenses, to pay his

15   son Peter Wolf, and otherwise dissipate all of the assets

16   despite the fact that he's been served as a citation that not

17   only required him to produce documents but prohibited him from

18   making transfer of the -- of judgment debtors here which is

19   exactly what's happening, right.  I mean, it's clear from the

20   evidence, as in -- as in our motion to compel turnover of the

21   assets states that this one publication, the Monday Morning

22   Quarterback, has just been -- the initial transferor who did

23   it to avoid his creditors is now magically getting all the

24   income from the Monday Morning Quarterback.

25           So --

1          THE COURT:  I understand your --

2          MR. WOLF:  Do I get to speak?

3          THE COURT:  -- point, but you're going to have to put

4    it in writing again, updated with whatever additional

5    information you've obtained either through the hearing today

6    and/or the documents that have been produced, and Mr. Wolf

7    will get a chance to respond to that.

8          So I'm certainly not entering any orders today.  We

9    have to take this in the process that, you know, your -- I

10   understand why you regard these assets as assets of Mr. Wolf,

11   but that's what the citation process is to determine, and I'm

12   not going to assume that ex-ante.  You've had the evidentiary

13   hearing today.  You've gotten some documents.  If there are

14   additional documents you feel you're entitled to based on

15   Mr. Wolf's responses today, you can file that motion as well,

16   and I'll address that promptly.

17         But you need to renew your motion for turnover.  And

18   once you file that, I'll give Mr. Wolf a reasonable period,

19   though it's going to be fairly expeditious response to that

20   filing, and we'll see where we come out.

21         MR. DAWSON:  Very well.  If we could just note in the

22   order today that we are renewing the motion because the

23   citation process is -- was continued to today.  And so to make

24   it ongoing, I think we need --

25         THE COURT:  The citation process is continuing

1    because there's still discovery to be conducted.

2            MR. DAWSON:  Very good.

3            THE COURT:  As I'm understanding you're still looking

4    for additional documents, and I think there's a basis for you

5    to make that request.  So the citation proceeding is still

6    going forward.

7            Once the discovery phase is over and you submit a

8    motion for turnover, I'll -- Mr. Wolf will get a chance to

9    respond to that, and I'll rule.

10           MR. DAWSON:  Very well.

11           THE COURT:  All right.  Anything else right now?

12           And you can control that timing by when you get me

13   whatever motions you think I need to address.

14           MR. DAWSON:  Okay.  And all I would ask, Judge, is if

15   we could, if we could set an outside date that the citation is

16   continued to for good cause because that's what the Illinois

17   statute provides that -- for -- to continue to be --

18           THE COURT:  It has to be a date certain?

19           MR. DAWSON:  It doesn't have to be a date certain.  I

20   think before you said it was -- it was related to the motions

21   which you haven't finally ruled on.  You gave us leave to

22   renew them.  And that's why I'm asking to make sure we renew

23   them.  But if we don't -- if you would rather update them in

24   our renewal, that's fine.  I just want to have something in

25   the order today that says the citation is continued for good

1    cause showing -- pending the renewal of the motion or

2    something like that, if Your Honor would agree to that.

3              THE COURT:  That seems fine.

4              MR. DAWSON:  Very well.  Thank you, Judge.

5              THE COURT:  Okay.  All right.

6              Mr. Wolf, you're excused today.  I want to remind you

7    if there's any change in your contact information, whether

8    it's address, phone number, e-mail, information that's on

9    record with the Court, you need to advise my clerk, Ms. Rone,

10   of any such change and advise counsel for the trustee of any

11   such change promptly so that we can ensure that we maintain

12   good, timely communications.

13             But at this juncture, until and unless you want to

14   respond to some further filing by the trustee, you don't need

15   to take any further action at this moment without further

16   order of the Court.  All right.

17             All right.  We're adjourned for today.

18             MR. DAWSON:  Thank you, Judge.

19      (Proceedings concluded at 4:58 p.m.)

20

21                           *   *   *   *   *

22        I certify that the foregoing is a correct transcript

23   from the record of proceedings in the above-entitled matter.

24   */s/Kelly M. Fitzgerald*              *September 23, 2024*
     _____      _____
25   Kelly M. Fitzgerald                 Date
     Official Court Reporter